COOK v. SOUTHEASTERN LIME & CEMENT CO.

(District Court, D. South Carolina. June 14, 1906.)

SHIPPING—DAMAGE TO CARGO—DANGERS OF THE SEA.

Where it is shown that a wooden vessel was seaworthy at the inception of her voyage, that the cargo was properly stowed and protected, that she was properly provided with pumps and the same were properly worked, that her hatches were properly secured, and that she encountered on her voyage heavy seas of unusual violence adequate to strain her seams and cause her to take in an unusual quantity of water, damage to her cargo therefrom, which it is not shown could have been avoided by the exercise of ordinary skill and care, is within the exception of "dangers of the sea" in the bill of lading, for which she is not liable.

[Ed. Note.—Losses by perils of the sea, see note to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

In Admiralty.

Nathans & Sinkler, for libelants.

Mordecai & Gadsden and Rutledge & Hagood, for respondent.

BRAWLEY, District Judge. The libel is for the balance due as freight on a cargo of cement, and the answer admits that the amount of freight money is correctly set forth, but claims that there should be deducted therefrom an amount covering the damage to the cargo and the expense of rehandling it, which would leave nothing due, and alleges:

"That the said schooner, its master and owners, were guilty of negligence in that they left the port of New York with her bottom badly calked and in an unseaworthy condition, and without having her decks properly protected and calked, in consequence of which the cement in wood in the lower part of the hold was damaged, as well as the cement in sacks above."

The schooner sailed from New York November 30, 1905, with a cargo of 1,000 barrels and 24,000 sacks of cement, arriving in Charleston December 6th. When the cargo was unloaded, it was found that 606 barrels and 1,455 sacks had been damaged by water, requiring rehandling and sifting, and the net loss proved is 116 barrels and 319 sacks.

As it is the primary obligation of the carrier to carry with reasonable care, such an unusual damage as is proved in this case raises a presumption of fault and puts upon the ship the burden of proving that the loss falls within some of the exceptions of the bill of lading. The only exception in the body of the bill of lading is the "dangers of the sea." Further exception is stamped on it by a rubber stamp as follows, "Vessels not accountable for leakage, breakage or calking," and, as the libelants claim that the damage was due to the "dangers of the sea," it is for them to show a sea peril adequate to cause such loss in a seaworthy ship. The testimony shows that the "Mary B. Baird" was a schooner about 15 years old; that, during the fortnight preceding the taking on of this cargo, she was in the dry dock in New York for recalking and repairs, and was there examined by an inspector of the Atlantic Insurance Company, who made a careful inspection in behalf of that company, which insured the cargo. This

inspector testifies that the ship was in good seaworthy condition. One of the port wardens of Charleston, who examined the vessel on her arrival in Charleston, testifies that the hatches were well covered, tarpaulin well secured and battened, and seams well calked and cemented; that the cargo was particularly well stowed and dunnaged. The barrels were laid in a single tier upon dunnage 10 or 12 inches in depth, and the sacks were in layers on top of the barrels. Some of the damage was undoubtedly caused by water leaking through the forward hatch, but there was other damage not so caused. The port warden testified to seeing evidences of the lower part of the barrels having been wet. The chief witness for respondent testifies that some of the barrels were wet both at top and bottom, and bore signs of having lain in water; that the barrels were lined with stiff paper; and that the damage could not have been caused merely by water dashing against the outside of the barrels. It is difficult to understand how so much damage could have been caused by the ordinary leakage to be expected in rough weather, and from the blowing of the water in the rolling of a ship, but what has been called "the perversity of inanimate things" often baffles explanation.

There is no testimony which contradicts or impeaches that of the inspector who examined the ship in New York, and I am bound therefore to hold that the ship was seaworthy when she sailed. The testimony of the port warden that the hatches were well secured and battened, and seams well calked and cemented on her arrival in this port, is not contradicted, and no fault is alleged or proved as to the stowage of the cargo, which he says was rather better than the average. The testimony also shows that the ship was well provided with pumps, and that the ship was regularly pumped. The master, the mate, and a seaman were examined for the libelants. They testify that they encountered a strong gale from the northwest when they came out of New York, but after that there was no storm, but all of them say that they had very rough weather all the way down, heavy seas washing across the deck all the time, and the vessel laboring heavily. The mate and seaman both testify that it was the roughest passage they had ever had in southern waters. The question for decision therefore is whether the rough weather described was one of the ordinary incidents of a sea voyage, or whether it is to be considered one of the "dangers of the sea," within the exception of the bill of lading. "Perils of the sea" are the exceptions in almost all marine undertakings, and the phrase has been defined in innumerable cases. Sometimes it is construed as equivalent to an act of God, but it has grown to have a wider signification, and the expression is generally construed to denote those accidents at sea peculiar to navigation arising from irresistible forces or overwhelming power which do not happen by the intervention of man, and cannot be guarded against by the ordinary exertions of human skill and prudence. Any loss which might have been avoided by the exercise of reasonable skill or diligence, at the time when it occurred, is not deemed such a loss by the perils of the sea as will exempt the carrier from liability; but a loss from the effect of storms and

tempests and straining the ship or causing her to leak, whereby damage is done to the goods, may be well attributed to the perils of the sea, although in one sense they may be ordinary accidents. It is well known, and has been proved in this case, that all wooden vessels will leak a little. That does not render them unseaworthy, and wherever it is proved, as it has been here, that a vessel was seaworthy at the inception of her voyage, that her hatches were well secured, that her cargo was well stowed, that her pumps were efficient and properly worked, that she encountered heavy seas which washed across her deck, that she labored heavily, that the rolling caused by such heavy seas was calculated to strain her seams and cause her to take in water, and that such rolling prevented the pumps from discharging the water, I must conclude, upon the authority of the decided cases, that the damage must be attributed to "dangers of the sea," for which the ship was not liable under the exception of the bill of lading.

In The Warren Adams, 74 Fed. 413, 20 C. C. A. 486, the court says:

"Where a vessel, soon after leaving a port, becomes leaky without stress of weather or other adequate cause of injury, the presumption is that she was unsound before setting sail. The law will intend a want of seaworthiness, because no visible or rational cause other than a latent or inherent defect in the vessel can be assigned for the result. But where it satisfactorily appears that the vessel encountered marine perils, which might well disable a stanch and well-manned ship, no such presumption can be invoked."

In The Ontario (D. C.) 106 Fed. 329, Judge Brown, a very able and experienced admiralty judge, reviewing many of the cases, says:

"Leaks arising in the course of heavy weather to a ship proved by abundant testimony to have been carefully observed and tested in the particulars complained of, and found in all respects reasonably fit for the voyage, are held to be properly attributable to the excepted perils or 'dangers of the sea,' and not to unseaworthiness."

The rolling of the ship, in what all the witnesses testify to have been uncommonly rough and heavy seas, with the attendant straining, furnishes a sufficient and reasonable explanation of the leaking. This rolling would prevent the pumps from exhausting all the water, and the damage from the blowing of the sea water from the hold, and from the taking in of water through the hatches, was a damage which could not have been avoided by the use of ordinary care. No human strength could resist, and no human foresight could prevent, the operation of these elements. Absolute impregnability to the assaults of the elements is not the test of seaworthiness. The test is whether she was reasonably fit for the contemplated voyage. Nor is there any rule which defines with unfailing accuracy the degree of violence of winds or waves which constitute a peril of the sea. Cross-seas of unusual violence are sometimes so held, and there is a case which holds that the blowing of the vessel is a peril of the sea. It has been held, too, that the mere rolling of a vessel in a cross-sea is not of itself a peril of the sea. It has been also held that the term is not to be restricted to damage inflicted by the extraordinary violence of the winds and waves.

One of the definitions most commonly cited is that the term embraces "all marine casualties resulting from the violent action of the elements, as distinguished from the natural, silent influence upon the fabric of the vessel, casualties which may, and not consequences which must occur"; but the rule deducible from all the cases examined is that, when it is proved that the ship was seaworthy at the inception of her voyage, that the cargo was properly stowed and protected, that she was properly provided with pumps, and the same were properly worked; that her hatches were duly secured, and that she encountered on her voyage heavy seas of unusual violence, adequate to strain her seams and cause her to take in an unusual quantity of water, it is for the shipper, under a bill of lading of this character, to show that the damage could have been avoided by skill and diligence, and, there being no such proof in this case, the decree must go for the libelants.