## THE RAPPAHANNOCK.

(Circuit Court of Appeals, Second Circuit. January 9, 1911.)

### No. 58.

1. SHIPPING (§ 132*)—DAMAGE TO CARGO—EXCEPTION IN BILL OF LADING—BURDEN OF PROOF.

The burden rests upon a lake carrier, who, having agreed to deliver in good condition, "the dangers of navigation excepted," delivers cargo water-damaged, to show that the damage was caused by a danger of navigation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 479–482; Dec. Dig. § 132.*]

2. SHIPPING (§ 132*)—DAMAGE TO CARGO—SEAWORTHINESS OF VESSEL.

The cargo of grain carried by a steamer from a Lake Superior port to Buffalo was found on arrival to have been damaged by water escaping from a crack in the main feed pipe running through the cargo space between the boiler and engine. Such construction was not unusual, and the vessel had an A1 rating, but had been built for 11 years, during which time the pipe had not been renewed, and had not been thoroughly inspected for more than a year, being covered with asbestos and inclosed in a box, which had not been removed in that time. Rough weather was encountered on the voyage, but not worse than was to be expected at the season. *Held*, that the evidence was not sufficient to sustain the burden of proof resting on the vessel to show that the damage resulted from a danger of navigation within the exception of the bill of lading, rather than from a defect in the pipe which rendered her unseaworthy at the beginning of the voyage.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 132.*]

Appeal from the District Court of the United States for the Western District of New York.

Suit in admiralty by the Northern Elevator Company against the steamer Rappahannock; the Davidson Steamship Company, claim-

ant. The suit was brought to recover damages sustained by a cargo of grain shipped by the steamship Rappahannock, in October, 1905. The voyage was from ports in Lake Superior to Buffalo. Decree for respondent (173 Fed. 829), and libelant appeals. Reversed.

Wallace, Butler & Brown (A. G. Thacher, of counsel), for appellant.

Clinton & Clinton (George Clinton, Jr., of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. The grain was shipped under bills of lading which acknowledged its receipt "in good order and condition" —"to be delivered in like good order and condition, the dangers of navigation excepted." The grain was delivered in greatly damaged condition through contact with water while in the hold. This water dripped through a crack in the main feed pipe, which pipe extended about nine feet through the cargo space between the engine and the boiler. Manifestly the ship would be liable for such damage unless she can bring herself under an exception which protects her. The exception relied upon is "dangers of navigation," an equivalent of the old expression "perils of the sea." As we have pointed out in Oil Seeds Co. v. S. S. Konigin Luise (opinion filed to-day) 185 Fed. 478, if the exception read "not liable for leakage from boilers and connections," the ship would be excused, unless it were shown that the leakage resulted from some negligence on her part; but, where the exception reads "perils of the sea," the burden rests upon the carrier, who, having agreed to deliver in good condition, delivers cargo water-damaged, to show that the damage was caused by a peril of the sea. The only real question in this case is whether the claimant has borne that burden and satisfactorily shown that damage resulted from the sea peril, without negligence on the part of the ship.

The following statement of the facts proved is mainly a quotation from the findings of the District Judge, with some additions and modifications:

The Rappahannock was built 11 years before the accident and had been repaired in 1904. It was not unusual, in vessels constructed for service on the Great Lakes, to have a feed pipe running from the engine to the boiler, which was situated in another part of the vessel. By the Inland Lloyds' register for 1905 she was rated in class A1, signifying a high grade and approved system of water pipes. Subsequently, and after this controversy arose, her rating was reduced. "It is probably true that at the present time her general construction would not be approved for carrying grain, but in 1905 when she was given her classification it was not criticised." The pipe was of wrought iron one-quarter inch thick and about 2½ inches in diameter. Although such pipe comes in lengths long enough to bridge the distance which it ran through the cargo space, two lengths were coupled, not quite midway, but nearer the boiler room bulkhead. Each length was threaded and screwed into the coupling nearly to the end of the thread. There is a conflict between the expert witnesses as to whether this method of construction would or would

not have a tendency to weaken the piping at the joint. The deck was not planked in the cargo space, the pipe running about on a line where the main deck beams would be. The pipe was covered with asbestos, and with this covering had a diameter of about five inches. It was inclosed in a wooden box having an inside diameter of about six inches. The box was supported on deck beams, which projected out to the edge of the hatch aft near the engine room and forward by the boiler room and was bolted or spiked to the deck beams. There was room so that the pipe could move in the box. The asbestos covering was to keep the heat in the pipe; the box, to protect the pipe from the grain.

After the damage was discovered and the grain in part removed, the pipe was stripped. It was found to be cracked at the bottom of one thread at the edge of the coupling. The crack went just through the pipe, probably three-quarters of an inch long; but the pipe was not broken off. The pipe looked apparently good except for this crack, and was not rusty except a little bit of brown where the water had been running through. The thread being cut into the pipe one-sixteenth, the pipe would not be as thick there as elsewhere, and would break off there easier than any place else. A thorough inspection of such piping can be had by tapping it with a hammer. Manifestly this could not be done while the asbestos and the boxing remained on. It is apparent, therefore, that, with a single exception, the various inspections which are testified to amount to no more than an investigation to see if water was coming or had come through these coverings. The last inspection with the covers removed was had in the summer of 1904, when the vessel was being repaired.

We cannot concur with the District Judge in the finding that at the inspection by United States officers in September, 1905, the pipe was tapped with a hammer. There is not a particle of evidence to show that the pipe was stripped at that time. On the contrary, the captain testified that he was present at this very inspection, and, elsewhere, that the boxing was not taken off at any of the inspections of which he had testified. The chief engineer corroborates him, saying the pipe was boxed at the time of the September, 1905, inspection. At this inspection the hydrostatic test was applied to boilers and connections, including this pipe. The normal pressure when in service is 160 pounds, the hydrostatic test runs up to 240 pounds, and as soon as that is reached the pump is shut off and the pressure runs down; the parts being under pressure somewhat less than two minutes. If sufficient water escapes through a leak during this test to soak through the asbestos and ooze out of the box, it may be seen; but if very little comes through it would seem that it might not indicate its presence on the outside of the box. This test is a well-known one. When the parts under test are open to inspection, it will reveal the presence of a leak by water oozing through. It may also develop an incipient crack into a fissure, but if it does not do so it would seem not to indicate, by itself, the presence of the incipient crack, and, apparently for that reason, it is customary for the United States inspectors, when the pressure is on, to test also by tapping with a hammer. Certainly they did not use a hammer on this pipe,

for it was boxed, at the time. We are not satisfied that the proof shows any such inspection, since the summer of 1904, as would negative the existence of an incipient crack at the place where the leak subsequently developed.

Moreover, reasonable prudence called for more frequent thorough inspections than might have been required some years before. The pipe had been in use without renewal for ten years, and while we think that the testimony of libelant's experts as to pulsation of the water passing through the pipe is somewhat exaggerated, there must have been some, and it was to be expected that the pipe was not as well fitted to resist strains as it was when new. Claimant contends that, because the pipe had gone ten years without leaking, it had proved itself sufficiently strong to withstand the ordinary lake storms. To this proposition we cannot entirely assent. After service for some months, it might fairly be assumed that the pipe was a good one, since no flaw had developed; but nothing in use will wear forever, and as time goes on every appliance of this sort draws near the end of its life. The experts for libelant estimate the serviceable life of such a pipe so placed and used at about ten years. Even if its normal life were longer, it is a perfectly fair inference that it required more careful watching than it had required five years before. And this it does not seem to have received.

The evidence showed that the Rappahannock on this trip encountered three severe gales, on Lakes Superior, Huron, and Erie, respectively. The captain and mate estimated the wind velocity at 60 miles an hour. They encountered heavy seas, sometimes quartering; but in the fall of the year such gales and seas are not infrequently encountered on the Lakes, as the captain himself admitted. None of the witnesses claim or pretend that the gales were extraordinarily terrific, or that there was exceedingly heavy pitching and plunging of the vessel on the swells of the sea. Her barge, the Grenada, of about 3,000 tons displacement, was securely kept in tow throughout the entire voyage. It was not supposed by any of the officers or crew of the steamer that her seaworthiness was extraordinarily tried, although, of course, she labored and strained in the gales she encountered. There was no thought of the vessel foundering or going ashore. The waves were high enough to wash her deck and break a few doors and windows, besides sweeping off a pair of fenders which had been lashed down with rope. Some butts were slightly started on the port and starboard sides of the boiler house, the extent of the starting being an eighth of an inch; but there was no leak anywhere, no open seams, no evidence of rain in the waterways, except that some of the oakum had worked out a little, no damage in the engine room, the machinery was in line, and the engines fair in their settings. The butts which were started were not in the vicinity of this pipe. The crew made all necessary repairs.

The conclusion is that the Rappahannock encountered conditions of wind and sea which were not unusual at that season of the year. Seaworthiness imports ability to meet such conditions. Probably the "twisting" to which she was exposed opened the pipe at its weakest point; but whether the leak resulted because a seaworthy pipe was

exposed to some extraordinary strain, or because pipe weakened by age and by some incipient crack which had developed since its last thorough inspection over a year before, gave way under strains which were to be anticipated, and which would not have broken a seaworthy pipe, we cannot say upon this proof. The case is very similar to The Aggi, 107 Fed. 300, 46 C. C. A. 276, where sea water entered underneath the scroll work at the vessel's stem, owing to the fact that a number of bolts had become loosened. We said:

"It is contended for the vessel that they were loosened by the heavy weather upon the voyage. This contention rests upon evidence that more or less severe weather was encountered, that there had been no leakage around the bolts upon previous voyages, and that the vessel was in an apparently sound and seaworthy condition when she received a general overhauling and inspection some two years before. There is no evidence of a later inspection of the bolts, and none that they received any injury upon the voyage beyond the wear and tear ordinarily incident to a voyage of that character and duration. In the most favorable view for the appellant, the presumptions authorized by the evidence are as consistent with the conclusion that the bolts were loose at the inception of the voyage as that they were loosened by any unusual strains to which they were subsequently subjected."

In our opinion the claimant has not sustained the burden of proving that the leak resulted from a "danger of navigation" within the exception of the bill of lading.

The decree is reversed, with costs of this appeal and in District Court, and cause remanded, with instructions to take further action in conformity to this opinion.