## 11036

### CLINCHFIELD FUEL CO. v. AETNA INS. CO.

(114 S. E., 543)

1. INSURANCE—SEAWORTHINESS OF VESSEL AND WHETHER LOSS OF CARGO WAS DUE TO PERILS OF THE SEA HELD FOR THE JURY.—In action on marine policy on a cargo of coal, the question of the seaworthiness of the vessel, and whether the loss of the cargo was. due to the perils of the sea, was for the jury.

2. INSURANCE—PROVISION OF MARINE INSURANCE POLICY HELD TO BAR ISSUE OF SEAWORTHINESS OF VESSEL WITHOUT SHOWING MISREPRESENTATION BY INSURED.—Under marine insurance policy providing that the seaworthiness of the vessel as between the assured and the assurer was admitted, the issue of the seaworthiness of the vessel could not be raised by the assurer without showing concealment. or misrepresentation by assured which would avoid that provision as well as other policy provisions.

3. INSURANCE—ALLEGATION THAT ASSURED KNEW VESSEL WAS IN BAD. CONDITION AND DID NOT INFORM ASSURER HELD TO CHARGE FRAUD.— Allegation of answer in action on marine policy on cargo of coal that, after plaintiff knew that the vessel in which the coal was. to be carried was leaking badly, and therefore unable to carry its capacity, plaintiff did not inform defendant of such material facts, and that by withholding such facts plaintiff induced defendant to issue the policy, which it would not otherwise have done, charged fraudulent concealment or misrepresentation.

4. INSURANCE—APPLICANT FOR MARINE INSURANCE MUST MAKE FULL. DISCLOSURE.—A contract of marine insurance involves the positive duty of the insured to disclose facts within his knowledge material to the risk, and his failure to do so is an implied representation that they do not exist.

5. INSURANCE—EVIDENCE HELD NOT TO SHOW ASSURED HAD KNOWLEDGE OF UNSEAWORTHINESS OF VESSEL BEFORE ISSUANCE OF POLICY.—In. action on marine policy on cargo of coal, testimony by the steward of the ship as to a conversation in plaintiff's office at which an.

agent of the plaintiff was present, during which the remark was passed that the vessel was leaking, was insufficient to show that plaintiff had knowledge of the defective condition of the vessel prior to the issuance of the policy, where there was no evidence that the remark was made to the agent or that he heard it, or was in hearing distance, and where the conversation took place on the morning after the policy was issued.

6. INSURANCE—INSURANCE AGAINST "PERILS OF THE SEA" HELD TO INCLUDE LOSS CAUSED BY WIND AND WAVES.—Under a marine policy insuring a cargo of coal against perils of the sea, the insured was entitled to recover for the loss of the coal, where the vessel was lost as a result of a storm and the action of the wind and waves; the phrase "perils of the sea" not being limited to extraordinary perils, but covering all kinds of marine casualties.

7. INSURANCE—EFFECT OF STIPULATION AS TO SEAWORTHINESS STATED.— Where a marine policy on a cargo to be carried on a vessel not owned by insured insures against "perils of the sea," and also that stipulates "the seaworthiness of the vessel as between the assured and the insurer is hereby admitted," the effect of the latter clause is either to demonstrate that any sea peril from which the vessel is lost is an extraordinary one, and therefore within the most limited meaning of the phrase "peril of the sea," since a seaworthy vessel can weather all but extraordinary perils of the sea, or to cast the loss, if the vessel be claimed by the insurer to be unseaworthy in fact, upon the insurer as one expressly assumed by such clause.

Before TOWNSEND, J., Charleston, October, 1921. Affirmed.

Action by Clinchfield Fuel Co. against Aetna Insurance Co. Judgment for plaintiff and defendant appeals.

*Messrs. Benet, Shand & McGowan; Harrington, Bigham & Englar,* and *Thos. P. Stoney,* for appellant, cite: *Importance of uniformity in Marine Insurance:* 122 App. Cas., 484. *Non-disclosure of material facts voids the policy:* 3 K. B., 470; 1 Pet., 185; 107 U. S., 485; 36 Fed., 118; Whart. Ag., Sec. 708; May, Ins., Secs. 122, 123; 40 Am. Dec., 345; 17 Wend. (N. Y.), 359; 3 Brev., 522; 1 Brev., 452; 14 Fed. Cas., No. 7920, 840; 10 Pet., 507; 65 Am. Dec., 553; 3 Am. Dec., 217; 3 Burr, 1905; 2 J. B., 595; 12 App. Cas., 531; 3 Doug., 41; 3 K. B., 470; 20

Cyc., 617; 3 Joyce, Ins. (2d Ed.), Secs. 1787, 1917; 1 Arnold Mar. Ins. (10th Ed.), 750, Sec. 575. *No proofs of loss filed:* 26 Cyc., 708. *Definition of "Perils of the sea" in marine insurance:* 26 Cyc., 651, 652; 184 Fed., 291; 218 Fed., 744; 109 Fed., 167; 171 U. S., 450; 42 Fed., 861; 33 N. J. L., 543. *Burden of proof as to loss from peril insured against was on the plaintiff:* 3 Wheat., 168; 136 U. S., 408. *Admission of seaworthiness does not relieve plaintiff from proof of cause of loss:* Arnold, Marine Ins., Sec. 694; 6 El. & Bl., 192. *Perils insured against:* 26 Cyc., 659, 660; 19 A. & E. Enc. L., 1035; 1 Duer (N. Y.), 159; 12 App. Cas., 484; 6 I. B. D., 51; 122 Mass., 573; 62 Mo., 322; 2 K. B., 694; 78 L. T. Rep. (N. S.), 90; 5 B. & A., 161; 97 N. Y., 350; Joyce, Ins., Sec. 2735.

*Messrs. Miller, Huger, Wilbur & Miller,* for respondent, cite: *Perils of the sea:* 6 Words & Ph., 5296; 18 Pac., 155; 199 Fed., 968; 4 Fed. Cas., No. 2122; 146 Fed., 101; Caiver, Car. by Sea (6th Ed.), 122; 199 Fed., 968; 12 App. Cas., 484; 12 Rich., 13, 14, Fed., 226; 18 Pac., 155; 146 Fed., 101; 26 Cyc., 652. *Seaworthiness:* 269 Fed., 768; 14 Fed., 226; Abbott's Merchant Ship. (13th Ed.), 465; 20 Ohio, 200; 11 A. & E. Ann. Cas., 956; 1 Stra., 128. *Seaworthiness admitted on cargo:* Winter, Mar. Ins., 177; 12 Asp. Mar., Cas. (N. S.), 246; 16 Fed., 916; 19 Fed., 101; 15 L. Ed., 584; 14 Eng. Rul. Cas., 58; 14 Fed., 226; 13 M. & W., 392; 16 L. J. C. P., 194. *Plaintiff need not prove conditions subsequent:* 43 S. C., 26; 42 S. C., 14; 60 S. C., 477; 96 S. C., 375; 77 S. C., 294; 70 S. C., 75; 46 S. C., 541; 14 R. C. L., 1436. *Fraud:* Clark, Conts., 220; 11 Enc. P. & P., 217; 68 S. C., 421; 78 S. C., 398; 84 S. C., 474; 80 S. C., 407. *Where seaworthiness is warranted no necessity to communicate facts affecting such seaworthiness:* 26 Cyc., 620; 4 Fed., Cas. No. 2118; 19 Fed., Cas. No. 11278; 6 L. Ed., 407; 5 Fed., Cas. No.

2881; 18 Fed., Cas. No. 10836; 3 Asp. Mar., Cas. (N. S.), 134; 1 M. & L., 35.   *No evidence of non-disclosure sufficient to vitiate policy:*   21 L. Ed., 827; 5 Fed., Cas. No. 2881; 15 Pick., 310.   *Insured's obligation to reveal terminates upon acceptance of risk:*   26 Cyc., 623; Joyce, Ins., 2947; 1 Asp. Mar., Cas. (N. S.), 225; 2 Asp. Mar., Cas. (N. S.), 504; 4 McC., 511.   *Construction of "all other loss" clause:*   1 Fed., Cas. No. 486; 26 Cyc., 659.

October 12, 1922.

The opinion of the Court was delivered by Mr. Justice Cothran.

Action instituted October 26, 1920, upon a policy of marine insurance by which the defendant insured the plaintiff in the sum of $1,215.00 against loss, due to the happening of perils of the sea and other marine risks, of a cargo of coal shipped by the plaintiff on board the steamship Northwestern from Charleston, S. C., destined for Cuba, direct or otherwise.   The vessel was owned by the Clinchfield Navigation Company, and was chartered from it by the plaintiff, the owner of the cargo, for the purpose of carrying a cargo of approximately 2,000 tons of coal, valued at $20,430.00, and insured under various policies, among which was one now under consideration.

The vessel was lost at sea by reason of being beached by the captain on the coast of Florida, it being at the time in a sinking condition, and the beaching, as claimed by the captain, being accomplished in an effort to save the crew and possibly the vessel.

The case was tried before Judge Townsend and a jury at Charleston, the result of the trial being a verdict for the plaintiff for the full amount claimed.   The defendant has appealed, and, as stated in the brief of its counsel, raises by its exceptions the following issues of law:

(1)   That the Circuit Judge erred in charging the jury that the failure of the plaintiff to disclose certain

material facts, which concealment the defendant claimed avoided the policy, must have amounted to fraud.

(2) That there was no evidence tending to show that the plaintiff had filed proofs of loss as required by the policy.

(3) That the testimony shows that the loss did not occur as a result of a peril of the sea or other peril insured against.

(4) That the Circuit Judge erred in defining what was meant by "perils of the sea," as referred to in the policy.

The issue of law will be better comprehended by a preliminary statement of the facts of the case.

The vessel was an old one, built of wood in 1881, rebuilt in 1902, and again in 1907, and had been tied up at Green's Point for two years. The present voyage was the only one she had taken in that time. In January, 1920, she left Perth Amboy, N. J., for Charleston under her own power and without cargo, carrying about 180 tons of coal as ballast. She put into Norfolk on account of boiler troubles and was towed from Norfolk to Charleston. There she underwent considerable repairs, as recommended and supervised by a representative of the American Bureau of Shipping, "a classification society for the United States of all the insurance companies and those interested in the condition of vessels." The repairs were completed on March 13, 1920, and a certificate of seaworthiness was issued by the proper authorities. The loading was then commenced and was completed on Thursday, March 18th. It appears that the full capacity of 2,000 tons was not loaded on account of a leakage in the vessel which developed while the loading was in process, only 1,687 tons being loaded, which, with the 180 tons of ballast, made 1,847 tons on board.

Engerbretson, the first mate of the vessel, testified for the defendant, that he was in charge of it when the coal

was being loaded; that water was coming in through the bow and stern post and down in the forepeak of the ship; that he stopped loading and sent for Capt. Jensen; that the Captain and Bayles, port captain of the navigation company, owner of the vessel; that he showed them where the water was coming in; that before starting to load he directed the carpenter to sound the bilge every 20 minutes and report; after the loading had progressed, the water increased to 9 or 10 inches in the bilges, which he did not consider excessive, and kept on loading; that after the twenty-fifth car had been loaded the water had increased to nearly 2 feet; that he then stopped the loading and took on no more coal; that, after the vessel was then taken out into the stream and had been pumped dry, the water in the bilges increased 11 inches in one hour; this was on the morning of Friday, March 19th; that he reported the fact to the Captain and advised a survey of the vessel; that the Captain replied that it had been inspected once and that he was going to lie in the stream a couple of days and see if the ship would tighten up; that they had some words over the matter, which resulted in his discharge; that in some places the water was dripping in, and in other places "it was pouring in, streams coming in."

Nelson, the carpenter of the ship, testified for the defendant that he was ordered by the first mate to take soundings of the bilges every 20 or 30 minutes, and on doing so found 10 or 11 inches of water in the bilges, kept on sounding until the water rose to 2 feet, reported that to the mate, and the loading stopped; that he personally inspected the forepeak with the mate, and found that the water was coming in "in some places in streams from the side"; that the pumps were started and the ship dried; that the pumps were stopped for an hour, and at the end of that time 11 inches of water had come in. Capt. Jensen denied the statement of Engerbretson that the loading

was stopped on account of the vessel leaking, stating that the ship was taking on more water than when she was light; that he lay in the stream some time waiting for clearance papers and to get new members of crew, not mainly for seams to swell and tighten up; that all wooden vessels leak.

On Friday, March 19th, Charles Britt, agent of the plaintiff, who had charge of the loading of coal for the company, telegraphed the company at New York that the loading had been completed at 2 a. m.; that the total cargo, including 80 (180?) tons on board prior to loading was 1,857 (1,847?) tons and 1,220 pounds, and asking that insurance be taken out. He testified that he was not at the ship while the loading was in progress, and knew nothing of the leaking of the vessel. The policy of insurance was issued the day the telegram was sent, Friday, March 19th.

On Saturday, March 20th, the ship sailed for Cuba going down the East Florida coast. The captain's account of the voyage is substantially this:

"We sailed from Charleston on Saturday, March 20th; encountered awful bad weather. The ship was beating and rolling something unusual, causing it to leak. First knew of unusual trouble early on Sunday or late Saturday night. The ship seemed to have opened up her seams and was leaking. There was an increasing northeast wind and quite a lot of big northeast swells, causing the ship to jump from bow to stern. The weather increased until the time the ship was beached, at which time the wind was about 60 miles an hour, or between 50 and 60. Ship was continually dipping from 30 to 40 degrees on each side and at the same time jumping up and coming down at the stern and up at the bow. The rolling caused the vessel to labor and the seams to open up; took soundings Sunday night, and found more water in the ship; started pumps, but ship was leaking more and more; pumps choked up with cinders,

21—S. C.—121

which came by reason of the washing about of the water in the ship; in order to save the men and possibly the vessel, ordered it to be beached. In his opinion the weather encountered amounted to a storm. Within a short time after the vessel was beached, it was broken up by the waves, and both it and the cargo were lost."

The testimony of Nelson, the carpenter, does not bear out the statements of the captain. He testified that he was on watch Saturday night and Sunday morning and took soundings; that on Sunday morning the ship was leaking badly; took soundings through the day and found the water was increasing; that the pumps were working; that they passed Jacksonville Monday morning; that there was a little wind and a heavy sea, the wind 20 to 30 miles an hour; that the wind increased Monday morning; sea was heavier; that the ship was beached about 3 o'clock p. m. on Monday on account of her leaking so badly.

From the foregoing abstract of the testimony there appears grave doubt upon the issues of the seaworthiness of the vessel and the loss of the cargo by reason of "perils of the sea." Both, however, were questions of fact for the jury, under proper instructions from the Court.

As to the seaworthiness of the vessel: The testimony induces a strong conviction that the vessel was not seaworthy when it sailed, notwithstanding the fact that it was inspected before being loaded and was given a certificate of seaworthiness by the proper authorities before it sailed. But the difficulty confronting the defendant is that by the stipulation in the policy, "The seaworthiness of the vessel as between the assured and assurers is admitted," it has placed itself in a position where that issue cannot be raised without showing a case of concealment or misrepresentation on the part of the coal company, which

would avoid that provision along with all other provisions of the policy.

The defendant insists that it has offered such testimony, and that the presiding Judge erred in imposing upon it not only the burden of showing concealment or misrepresentation as to the condition of the vessel, but of a fraudulent concealment or misrepresentation.

In the first place, the line of demarcation between a representation that is untrue, known to be so, which is made for the purpose of inducing action, and a representation fraudulently made, is exceedingly shadowy, and the same may be said of the concealment of a material fact. The allegation of the answer is that after the plaintiff knew that the vessel in which the coal on which the insurance was asked was to be carried was in bad condition and leaking badly, and for that reason was unable to carry its capacity, the plaintiff did not acquaint the defendant with knowledge of such material facts, and that by withholding such facts the plaintiff induced the defendant to issue the policy, which it would not have done had the true facts been disclosed. This amounts to as complete a charge of fraud as if the pleader had so specifically labeled it. The contract of marine insurance, as has been frequently held, is one of *uberrima fides,* involving the positive duty of the insured to disclose facts within his knowledge material to the risk; his failure to do so is an implied representation that they do not exist. Clark on Contracts (2d Ed.), 220; *Plunkett v. Ins. Co.,* 80 S. C., 407; 61 S. E., 893. The Circuit Judge therefore did not commit error in charging that the defendant must show a fraudulent concealment.

In the second place, the defendant has offered no testimony tending to show that the coal company had any knowledge of the alleged defective condition of the vessel prior to the issuance of the policy. The only

testimony approaching that issue was that of the steward, who testified to a conversation in the coal company's office at which the agent of the company, Britt, was present, on the morning of the 20th, after the policy had been issued on the 19th, during which "the remark was passed" that the vessel was leaking.  He did not say to whom the remark was made, whether to Britt or some one else, or that Britt heard it or was. in hearing distance, or that the nature of the leaking was other than might have been expected, as the captain testified, of all wooden ships.  But, assuming that the remark was notice to Britt of the unseaworthiness of the vessel, such as to bind the coal company, it is shown to have been made on the 20th, the day after the policy was issued.  The obligation of the insured to disclose material facts is limited necessarily to such facts as are within his knowledge at the time the policy is issued.  26 Cyc., 623; Joyce, Ins., 2947.

As to the perils of the sea:  It is impossible to reconcile the variant expressions of the Courts and textwriters as to the legal interpretation of the phrase, "perils of the sea."  It occurs oftenest in bills of lading and in insurance policies.  In the former it is made the ground of the carrier's exemption from liability; in the latter the ground of the insurance company's liability; and we find a very great strictness of interpretation of the phrase in bills of lading where the carrier is claiming an exemption and very great elasticity in insurance policies where the assured is claiming a recovery.  In some of the cases arising under insurance policies the Courts have applied the same strictness as in bills of lading.

In reason it does not appear that there should be any difference of interpretation of the phrase appearing in the two classes of contracts; and it is so held by the Supreme Court of the United States in the case of *The Booth,* 171 U. S., 450; 19 Sup. Ct., 9; 43 L. Ed., 234:

"Generally speaking, the words 'perils' of the sea' have the same meaning in a bill of lading as in a policy of insurance."

But there is a marked difference in the availability of the condition as an exemptive defense in cases involving bills of lading, and as a basis of liability in cases of insurance policies, when it appears that the fault of the master or crew contributed to the loss. In cases of bills of lading, although the loss may have been caused by a "peril of the sea," the carrier will not be absolved, while in cases of policies of insurance the company will not be absolved for the reason that the assured does not warrant due care on the part of the master and crew. The engagement of a carrier is to transport and deliver, unless prevented by the act of God or the public enemy, or unless the loss has been occasioned by some specified cause, without contributing negligence on his part. To relieve himself from liability, he must bring himself within the exemptions and show also that the loss was not caused by his negligence. He is an insurer against all loss except that happening without fault on his part, within the stipulated exceptions. The engagement of an insurance company is to indemnify against loss by "perils of the sea"; and, if it so happens, the insurance company is liable, regardless of the fact of negligence on the part of the master or crew. These considerations, however, should not affect the interpretation of the phrase. It should not be shifted by a consideration of the particular contract in which it occurs; so that through a strict interpretation the liability of the carrier is fixed by a denial of the exemption, and through an elastic interpretation the liability of the insurance company is fixed by the inclusion of the loss within the description of the risks assumed by it. The phrase in bills of lading creates a condition of exemption, while in insurance policies it creates a condition of liability.

Many of the reported cases evince a disposition on the

part of the Courts to render it difficult for the carrier to come within the exemption, and comparatively easy for the insured to include his loss within the terms of the identical description. As a consequence, in the interpretation of the phrase occurring in bills of lading, definitions and principles have been announced which, applied to policies of insurance, would result in manifest injustice to the insured, and a palpable perversion of the intentions of the parties. While of opinion that the same interpretation should be given the phrase in each class of contracts and not contesting the interpretation announced in bills of lading, for it is not involved in this case, we decline to apply that interpretation to insurance policies.

In interpreting the phrase occurring in bills of lading it has been held that it includes only such losses as are of an extraordinary nature or such as arise from some irresistible force or some overwhelming power which cannot be guarded against by the ordinary exertions of human skill and prudence. *The Reeside,* Fed. Cas. No. 11657; *The Rappahannock,* 184 Fed., 291; 107 C. C. A., 74; *The Giulia,* 218 Fed., 744; 134 C. C. A., 442; *The Arctic Bird* (D. C.), 109 Fed., 167; *The Gulnare* (C. C.), 42 Fed., 861. Something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety.

The grasp of the thought is weakened and it is made elusive by the confusing use of the word "extraordinary." When it is declared that the insurer provides indemnity from extraordinary occurrences only, to what condition does this term apply? What is the relativity contemplated? It may be considered extraordinary as compared with an even voyage upon a placid sea; and yet it may be an entirely ordinary occurrence as compared with transportation by sea generally. The case of *The Gulnare* (C. C.), 42 Fed., 861, is an apt illustration of this confusion of ideas. The Court says:

"The protest states that she [the insured vessel] 'encountered heavy seas and rolled heavily.' This is not a peril which is insured against, but is only an ordinary peril which any strong vessel encounters everywhere."

Here the basis of comparison is made the occurrence naturally to be anticipated upon every voyage, in direct conflict with the declaration of the Court in the *Hazard Case,* 8 Pet., 557; 8 L. Ed., 1043, below referred to:

"They insure against losses from extraordinary occurrences, only; such as stress of weather, winds and waves, lightning, tempests, rocks," etc.

According to the rule laid down in the *Gulnare Case,* these would not be perils of the sea, extraordinary occurrences, but only ordinary perils which every strong vessel encounters upon every voyage.

So in *The Rappahannock,* 184 Fed., 291; 107 C. C. A., 74, where it was held that a storm in which the wind reached a velocity of 60 miles an hour was not a peril of the sea. The ground of this decision was that storms of such character were not unusual upon the lakes at that season of the year, and for that reason could not be considered extraordinary occurrences.

The correct thought is expressed and illustrated in the case of *The Xantho,* 12 App. Cas., 503, where it is said:

"It is clear that the phrase does not include every accident or casualty which may happen to vessels or cargo on the sea. It must be a peril 'of' the sea; yet it does not cover all damage of which the sea is the immediate cause. It does not, for instance, when used in an insurance policy, cover loss or damage resulting from the ordinary and inevitable action of the winds and waves, such as natural decay and wear and tear."

The insurance is against "perils of the sea," not extraordinary perils, and to hold that the phrase includes only the results of occurrences which could not have been reasonably anticipated, is to add a feature to the contract which the

parties have not stipulated for.   It is to infer that, when the insured paid his money for indemnity against loss by perils of the sea, he intended that the company should not be responsible if the loss occurred as a result of a storm, or the action of the wind and waves, which are well-known incidents of every voyage, the very things that he paid for protection against.   We are reminded of the language of Judge O'Heall, who referred to a technical contention as employing a subtlety that baffles common sense.

Expressions like that contained in the case of *The Giulia*, 218 Fed., 744; 134 C. C. A., 442, may be applicable to cases involving bills of lading, which is doubtful, but they certainly cannot be where policies of insurance like this one are involved.   The Court says:

"Perils of the sea are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

The converse of this proposition must be equally true, that if the occurrence was such as could have been "guarded against by the ordinary exertions of human skill and prudence," the occurrence will not be considered a peril of the sea, which, in effect, would hold the owner of the cargo who was not the owner of the vessel, responsible for the negligence of the master and crew, an obligation which he did not assume either in the contract of affreightment or in the policy of insurance.

We prefer to interpret the phrase in insurance policies as indicated in the following authorities:

"Perils of the sea embrace all kinds of marine casualties, such as shipwreck, foundering, stranding, collision, and every species of damage done to the ship or goods at sea by the violent action of the winds or waves."   26 Cyc., 652.

In the *Newport News* (D. C.), 199 Fed., 968, it is held:

"In order to find peril of the sea, the losses sustained need not be extraordinary, in the sense of necessarily arising from uncommon causes. Rough seas are common incidents of a voyage, yet they are certainly sea perils."

In *Bullard v. Insurance Co.,* Fed. Cas., No. 2,122:

"Gales of wind or heavy cross seas are not the ordinary action of the sea, in the sense of the law of insurance, and, when injury is suffered by a seaworthy vessel from their action on her, she is damaged by a peril within the policy.'"

In *Cook v. Lime Co.* (D. C.), 146 Fed., 101:

"* * * Wherever it is proved * * * that a vessel was seaworthy at the inception of the voyage, that her hatches were well secured, that the cargo was well stored, that her pumps were efficient and properly worked, that she encountered heavy seas which washed across her deck, that she labored heavily, that the rolling caused by such heavy seas was calculated to strain her seams and cause her to take in water, and that such rolling prevented the pumps from discharging the water, I must conclude, upon the authority of the decided cases, that the damage must be attributed to 'danger of the seas.' "

In Carver's Carriage by Sea:

"Upon this it must be remarked that the losses need not be extraordinary, in the sense of arising from causes which are uncommon. Rough seas, which are characteristically sea perils, are common incidents of a voyage."

In *Hazard v. Ins. Co.,* 8 Pet., 557; 8 L. Ed., 1043, the Court says:

"In an enlarged sense, all losses which occur from maritime adventures may be said to arise from the perils of the sea; but the underwriters are not bound to this extent. They insure against losses from extraordinary occurrences only, such as stress of weather, winds, and waves, lightning, tempests, rocks, etc. These are understood to be the 'perils

of the sea' referred to in the policy, and not those ordinary perils which every vessel must encounter."

In *Bullard v. Ins. Co.,* Fed., Cas. No. 2,122, the Court held:

"Gales of wind and heavy cross seas are not the ordinary action of the sea."

" 'Perils of the sea' mean all marine casualties resulting from the violent action of the elements, as distinguished from their natural, silent influence upon the fabric of the vessel; casualties which may, and not consequences which must, occur." *Caballos v. Warren Adams,* 74 Fed., 413; 20 C. C. A., 486.

"All navigation is perilous, and this policy does not say the indemnity is against extraordinary perils only. It is true we are in the habit of saying that the insurer is only liable for extraordinary perils, but this means nothing more than that a seaworthy vessel will endure safely all ordinary perils. It does not mean that a loss for which the insurer is liable may not come from the ordinary action of the sea, for it may; and the term is used only to describe those abnormal circumstances, be they what they may, of dangerous navigation under which the loss occurs." *Moores v. Louisville Underwriters* (C. C.), 14 Fed., 226.

"The tide of the sea is as ever present and as normal in its action as the current of a river. It ebbs and flows, but its action is understood, and a matter of almost accurate knowledge and calculation to navigators. Yet in *Fletcher v. Inglis,* 2 Barn. & Ald., 315, and in *Bishop v. Pentland,* 7 Barn. & C. (14 E. C. L., 53), 33, and other cases where there was no extraordinay action of the tide, its ordinary action occasioned a loss through defective fastenings with cables, that was held to be within the policy." *Moores v. Louisville Underwriters* (C. C.), 14 Fed., 226.

"We reach the conclusion that by the English law and practice a peril of the sea need not be extraordinary, in the

sense of being catastrophic or necessarily the result of uncommon causes, and that severe storms, rough seas, and even fogs may be comprised in the perils of the seas." *Ætna Ins. Co. v. Sacramento Co.* (C. C. A.), 273 Fed., 55.

"If the loss of the vessel arose from the ordinary circumstances of a voyage, or from sea damage or wear and tear, which, without the action of any extraordinary causes, was to be expected, the insurer is not liable. But if it happened in consequence of the violence of the winds and waves, running on rocks, or the like, there are perils against which the insurer agrees to indemnify." *Coles v. Ins. Co.*, Fed. Case, No. 2,988.

Heavy cross seas are not the ordinary actions of the sea in the sense of the law of insurance, and when injury is suffered by a seaworthy vessel from this action on her, she is damaged by perils of the sea within the meaning of the policy, although it appears that cross seas are common in the voyage insured. *Bullard v. Ins. Co.*, Fed., Cas. No. 2,122.

"It would be placing upon a policyholder too great a burden to require him in a case like this to demonstrate with exactness what particular force operated to make his loss, and that there was some extraordinary action of the winds or currents, or extraordinary stages of water, or the like. It would emasculate these policies and reduce their value to permit this company to escape on the facts of the case, because, forsooth, the witnesses could see nothing in wind, current, or navigation that was not in the usual and ordinary course." *Moores v. Louisville Underwriters* (C. C.), 14 Fed., 226.

It must be borne in mind that this is not a suit by the owner of the vessel as the insured, but by the owner of the cargo, who, so far as the evidence discloses, knew nothing about the vessel or its condition. The insurance company had as full opportunity to investigate

that condition as the insured; and, if it was unseaworthy, it could have ascertained that fact. And yet, without investigation, it issues a policy to the insured and inserts the clause: "The seaworthiness of the vessel as between the assured and the assurers is hereby admitted." That clause means one or the other of two things: (1) That the warranty of seaworthiness is to be taken as fulfilled; or (2) that the risk of unseaworthiness is assumed by the insurance company.

If it means the first, then the vessel must be considered as seaworthy; and, if so, it was able to withstand the ordinary sea perils of the voyage; and if it was thus able, but yet went down, it must follow that the cause of the wreck was the extraordinary action of the elements, in which case the strict rule applied in bills of lading would be fulfilled. If it means the second, it makes no difference even if from sheer rottenness the ship went down in a pefectly calm sea.

In *Cantiere v. Janson,* 12 Asp. Mar., Cas. (N. S.), 246, the suit was on a policy "on a floating dry dock," and admitting seaworthiness of that dry dock, which, as a matter of fact, was not seaworthy and broke in two and sank in the insured voyage. The insurer was held liable. The Court said:

"The result [of the admission of seaworthiness] may be stated in either one or two ways, either: (1) That the ship owner's warranty of seaworthiness is to be taken as fulfilled; or (2) that the risk of unseaworthiness is one which the underwriter accepts, with the result that if the vessel is lost by unseaworthiness the underwriter is liable."

In *Parfitt v. Thompson,* 13 M. & W., 392, the defendants had agreed that the ship should be considered, and was thereby allowed to be, seaworthy in her hull, tackle, and material for the voyage, the insured declaring that to the best of their knowledge and belief the ship was seaworthy for the voyage. At the trial the defendants attempted to show

that the vessel was lost in consequence of her being in a decayed and unseaworthy state, and contended that their admission of her unseaworthiness merely precluded them from contesting that fact in case the loss had happened by the perils of the sea, but that, if the loss happened in consequence of her unseaworthiness, they were at liberty to take advantage of that fact, as a ground for nonpayment of the sum insured.   But Sir Frederick Pollock, delivering the unanimous opinion of the Court, said:

"I cannot assent to the construction of the defendant's admission of seaworthiness which has been contended for. It seems to me that the admission inures for all purposes and amounts to a dispensation of the usual warranty of seaworthiness.   I cannot think the parties intended that, if the unseaworthiness alone were the cause of the loss, the plaintiff should have no right to recover.   It appears to me that, if the vessel had foundered in a perfectly calm sea, from a leak occasioned by rottenness, on the day after the policy was effected, the underwriters would have been liable."

In this view of the case the question of "perils of the sea" is practically eliminated, and, if the presiding Judge committed error in regard to it, no consequence can be attached thereto.   As a matter of fact his charge was more favorable to the defendant than it was entitled to, for in one instance he gave the defendant the benefit of the strict rule applied to bills of lading.

The ground of appeal based upon the refusal of motion for nonsuit cannot be sustained under the well-established rule that, where the defendant relies upon a forfeiture, the plaintiff may in reply offer evidence of a waiver, and that for that reason nonsuit is improper.   *Copeland v. Assurance Co.,* 43 S. C., 26; 20 S. E., 754; *Sample v. Ins. Co.,* 42 S. C., 14; 19 S. E., 1020; *Pickett v. Ins. Co.,* 60 S. C., 477;

38 S. E., 160, 629; *McManus v. Ins. Co.,* 96 S. C., 375; 80 S. E., 613.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.