## MOORES v. LOUISVILLE UNDERWRITERS.

*(Circuit Court, W. D. Tennessee.  November 23, 1882.)*

1. MARINE INSURANCE—SEAWORTHINESS.

   If the evidence in the case establish the fact of seaworthiness, there is, where a disaster occurs without any discernible cause, a presumption of fact that the loss was occasioned by some of the perils insured against.

2. SAME—EVIDENCE—BURDEN OF PROOF—JURY.

   When a disaster happens in fair weather and without apparent peril of navigation to cause it, there is, in the absence of other proof sufficient to countervail it, a presumption of the fact that the vessel was unseaworthy at the beginning of the voyage, but the assured may show by proof that the vessel was in fact seaworthy, and there then arises a presumption of loss by some peril of navigation covered by the policy, unless the insurer can show that it was·otherwise caused by some danger not within the policy.  The technical difficulties of the burden of proof are diminished in such cases by observing the distinction between that burden as a matter of pleading and the sometimes shifting exigencies of the testimony requiring further proof from the one side or the other. But in all these cases there is no fixed presumption of law or fact, but only a matter of inference by a jury from the particular facts of the case, and they are always to determine the issue according to the peculiar circumstances of each case.

3. SAME — POLICY—ADVENTURES — PERILS OF THE RIVER — SELF-DISTRIBUTING POLICY.

   Where the form of the policy is one for general use in the insurer's business, the word "adventures," associated with the words "perils of the lakes, seas, rivers, canals, *railroads,* fires, and jettisons," cannot be permitted to enlarge the phrase "perils of the river."  It is a self-distributing policy, to be construed in each case with sole reference to the subject-matter of the risk in that case, whether of lake, sea, river, canal, or railroad.

4. SAME—PERILS OF SEA OR RIVER.

   While it is settled that the phrase "perils of the sea" does not cover all losses that happen on the sea, there is a principle of construction which gives it as extended a meaning as can be reasonably done.  All navigation is perilous, and the rule that the insurer is liable only for losses occurring from extraordinary causes, means nothing more than that a seaworthy vessel will endure all ordinary perils; it does not mean that a loss for which the insurer is liable may not happen to a seaworthy vessel from the ordinary action of the sea, for it may, and the term is only used to describe those abnormal circumstances of dangerous navigation under which the loss occurs, be they what they may. Because the "peril" cannot be located, it does not follow there was none.

5. SAME—SEAWORTHINESS.

   The best and most skillful form of construction is not required to meet the warranty of seaworthiness, but only a sufficient construction for vessels of the kind insured and the service in which they are engaged.

6. SAME—RAFT.

   A raft is not, in the ordinary contemplation of the maritime law, a *vessel;* but where it is insured by a "cargo policy," and is in charge of a tow-boat, the principles of law governing a contract of insurance are applicable to it.

7. SAME—CASE STATED.

> Where a raft of logs was insured for a voyage in charge of a tow-boat, and coming to the mouth of a river up which it was to be placed a short distance, was lost under circumstances which did not disclose any extraordinary action of the elements, or, as far as could be observed, any negligence of navigation, and it was proven that the raft was "seaworthy," *held*, (1) that there was, in the absence of proof to the contrary, a presumption of loss by some unknown peril insured against; (2) that it was probable the loss was caused by the combined action of the currents of the two rivers, the strain of the tugs engaged in towing, and the possible unskillful or negligent navigation of the crews employed in the tow, and all of this being covered by the policy the insurer was liable.

The defendant company issued a "cargo policy" on a raft of logs to be towed by the steam-boat Trader from the mouth of the Obion river down the Mississippi river to the mills in the city of Memphis, situated a few hundred feet above the mouth of Wolf river. The words of the policy involved in the controversy were these: "Touching the adventures and perils which the said compnny is contented to bear and take upon itself, they are of the lakes, seas, rivers, canals, railroads, fires, and jettisons."

The tow-boat Trader, having the raft in tow, reached the mouth of Wolf river, and doubting her ability to land it signaled for assistance, when the harbor-tugs Vanderhoff and De Soto, in the habit generally gratuitiously, but sometimes for hire, of assisting the Trader and other tow-boats, went this time gratuitously to her assistance. The Vanderhoff took position up Wolf river, attached her cables to the raft, and was pulling up stream. The Trader, lying with her bow partially upon the raft, and the De Soto, with her bow squarely against the ends of the logs in the raft, were pushing up stream. The raft was next to and against some piles running from the bank and used in the tram-way of the railroad ferry transfer. This was the general situation, but no progress was made satisfactory to the Trader's captain. The De Soto's captain thought that the raft should be tied where it was, but the Trader did not assent to this, and the Vanherhoff in the distance kept on pulling. The De Soto had a signal for coal, (she was a coal tow,) and pulled out and left. A few moments after this the raft swung around towards the bank, jamming the Trader against another boat and the bank, breaking the Trader's wheel. About the same moment the raft parted, and a large portion of it floated off many miles down the river, and only a small portion of the logs floating away were saved.

There was proof by the plaintiff tending to show increased current by high water, and by the defendant that there was nothing extraor-

dinary in the state of the river, stage of water, wind, etc. The court found this fact in favor of the defendant.

There was also proof by the defendant tending to show that the raft was ill-constructed and not "seaworthy," and of the plaintiff that it was constructed as usual in such cases, and the court found this fact in favor of the plaintiff.

The plaintiff at first attributed the loss to the De Soto, filed protest and threatened suit against her owners. In the written account of the loss then filed this view of its cause was taken, but subsequently the plaintiff notified the insurance company that he should claim a loss on his policy, and demanded payment, which being refused, he brought this action. There was much proof by witnesses of their opinions as to what caused the loss; those of the plaintiff tending to the theory of extraordinary action of the currents and "boils" of the rivers at that place, and those of the defendant that the loss was due to the inherent weakness of the raft; but the general facts were as above stated, and are sufficient to explain the grounds on which the judgment of the court is based.

*Harry M. Hill* and *W. Y. C. Humes*, (with him,) for the plaintiff, cite: *Union Ins. Co.* v. *Groom*, 4 Bush, 289; *Washington Ins. Co.* v. *Reed*, 20 Ohio, 199, 208; *Patrick* v. *Hallett*, 1 Johns. 241; *Ellery* v. *New Eng. Ins. Co.* 8 Pick. 14; *Levi* v. *N. O. Mut. Ins. Assoc.* 2 Woods, 63; *Carruthers* v. *Sydebotham*, 4 M. & S. 77, 84; *Arnold* v. *United Ins. Co.* 1 Johns. Cas. 367; Ham. Ins. 35; *Walsh* v. *Washington Ins. Co.* 32 N. Y. 427; *Potter* v. *Suffolk Ins. Co.* 2 Sumn. 197, 200; *Barnewell* v. *Church*, 1 Caines, 217; *Wallace* v. *De Pau*, 1 Brev. 252; *Prescott* v. *Union Ins. Co.* 1 Whart. 399; *Brown* v. *Girard*, 4 Yates, 115; *Snethen* v. *Memphis Ins. Co.* 3 La. Ann. 474; *Parker* v. *Union Ins. Co.* 15 La. Ann. 688; *Empire Co.* v. *Union Ins. Co.* 32 La. Ann. 1081; *Bullard* v. *Roger Williams Ins. Co.* 1 Curtis, 148, 151; *Thompson* v. *Hopper*, 6 El. & Bl. 171, 192; *Hazard* v. *New Eng. Mut. M. Ins. Co.* 8 Pet. 557; *Martin* v. *Salem Ins. Co.* 2 Mason, 429; 3 Kent, Comm. (12th Ed.) 217–291, 300; *Magnus* v. *Buttemer*, 2 C. B. 876, (73 E. C. L. 876;) *Bishop* v. *Pentland*, 7 Barn. & C: 219, (14 E. C. L. 35;) *Patterson* v. *Harris*, 1 Best & S. 336, (101 E. C. L. 552;) 1 Parsons, Marine Ins. (1868,) 377, 544; *Fletcher* v. *Inglis*, 2 Barn. & Ald. 315; *Hale* v. *Washington Ins. Co.* 2 Story, 185; 1 Phil. Ins. 636; *Green* v. *Brown*, 2 Story, 199; *Newboy* v. *Read*, Park. 106; *Fremlow* v. *Oswin*, 2 Camp. 85; *Baker* v. *Ins. Co.* 12 Gray, 603; Dixon, Marine Ins. § 242; *Protection Ins. Co.* v. *Wilson*, 6 Ohio St. 553; *Coles* v. *Marine*

*Ins. Co.* 3 Wash. 159; *Anthony* v. *Etna Ins. Co.* 1 Abb. 344; *Miller* v. *Ins. Co.* 12 W. Va. 130; *Chandler* v. *St. Paul Ins. Co.* 18 Am. Law Reg. 385; *Palmer* v. *Ins. Co.* 1 Story, 364; *Yeaton* v. *Fry*, 5 Cranch, 335; 2 Arnold, Ins. 807; *Wheeler* v. *Walker*, 55 Ga. 256; *Hagar* v. *New Eng. Mut. Marine Ins. Co.* 59 Me. 463; Flanders, Shipp. 202, note 2, 294; 1 Bouv. Law Dict. 350; Ingersoll, Roccus, 111; 3 Phil. Ev. 275, and note; 1 Taylor, Ev. 212, § 205; 2 Taylor, Ev. 978; *Ins. Co.* v. *Wilson*, 3 Cranch, 187; *Ins. Co.* v. *Mordecai*, 22 How. 111; *Watson* v. *Ins. Co., etc.*, 2 Wash. C. C. 153; *Lawrence* v. *Minturn*, 17 How. 100; *Dupont de Nemours* v. *Vance*, 19 How. 170; *The Mohawk*, 8 Wall. 153; *Bulkley* v. *Naumkeag*, 24 How. 386; *Waters* v. *Merch. Louisville Ins. Co.* 11 Pet. 213; *Pope* v. *Swiss Lloyds*, 6 Sawy. 533; *Union Ins. Co.* v. *Shaw*, 2 Dill. 14; *Chase* v. *Eagle Ins. Co.* 5 Pick. 51; *Cary* v. *Burr*, 8 Q. B. Div. 313; *Lunt* v. *Boston Marine Ins. Co.* 6 FED. REP. 562, 566; *Hathaway* v. *St. Paul Ins. Co.* 1 FED. REP. 197.

*H. C. Warinner*, for defendant, cites: 2 Parsons, Marine Ins. 399, 518, 538; *Patrick* v. *Hallett*, 3 Johns. 76; *Talcot* v. *Commercial Ins. Co.* 2 Johns. 124; *Garrison* v. *Memphis Ins. Co.* 19 How. 312; *General Mut. Ins. Co.* v. *Sherwood*, 14 How. 351; Sansum, Dig. Ins. 1242; *Norrice* v. *Anderson*, L. R. 10 C. P. 58; *Cort* v. *Delaware Ins. Co.* 2 Wash. C. C. 375; *The China*, 6 Wall. 53; *Rugley* v. *Limited Mut. Ins. Co.* 7 La. Ann. 279; *Marcy* v. *Limited Mut. Ins. Co.* 11 La. Ann. 748; *Ins. Co.* v. *Tobin*, 32 Ohio St. 77; *Gastride* v. *Ins. Co.* 62 Mo. 322; *Flanney* v. *Marine Ins. Co.* 4 Whart. 59; *Coffin* v. *Phœnix Ins. Co.* 15 Pick. 291; *Johnson* v. *Finney*, 4 Yerger, 48; *Gardner* v. *Buchanan*, 5 Yerger, 81; *Turney* v. *Wilson*, 7 Yerger, 343; *Dyer* v. *Ins. Co.* 53 Me. 118; *Ins. Co.* v. *Tweed*, 7 Wall. 44; *Ins. Co.* v. *Boon*, 105 U. S. 117; *Breed* v. *Providence Washington Ins. Co.* 17 Blatchf. 287; *Rothschild* v. *Royal Ins. Co.* 7 Exch. 734; together with many of the cases cited for the plaintiffs, as above shown.

HAMMOND, D. J. This case has been twice argued,—the court, by stipulation, under the statute, sitting without a jury. On the first argument it seemed to me plain that, there being no *extraordinary* action of the elements, nor, so far as I could see, any apparent *peril* of the river to cause the loss, nor any proof of damage by some *unseen* peril of navigation, the judgment should be for the defendant company on the ground that there was some inherent defect in the thing insured, which rendered the raft incapable of enduring the *ordinary* strain of navigation, although the proof, outside the fact of loss itself, was satisfactory as to the "seaworthiness," or, more accurately, perhaps, as counsel call it, "riverworthiness" of the ves-

sel and raft. However, I based my judgment more on what then seemed to me to be the failure of the plaintiff to answer the burden of proving that the loss was occasioned by some peril of river navigation insured against, than on any resolution against him of the fact that it was not so caused.

The reargument was asked on the claim that, as a matter of law, if the "seaworthiness" at the inception of the risk be established by proof, as I held it was, the presumption would be that the loss occurred by a peril of river navigation, no matter whether the active agency causing it could be discerned or not. This is a question about which I find there is much conflict, and, to my mind at least, great confusion of authority and statement, some of which I imagine results from overlooking an important distinction adverted to by Mr. Flanders between cases arising on bills of lading against the carrier for a violation of his undertaking and those against an insurer for indemnity under his contract. Flanders, Shipp. 183. It is, I think, more a question of fact than one of law; and following a frequent declaration that it is a question for the jury and not the court, and believing, as I do, that the solution of such a question is better reached by the concurrence of twelve minds than the judgment of one, I have been inclined to require the parties to go to the jury; but it may be that the court should not, where the parties choose under the statute to waive a jury, decline to try the issues of fact, and this doubt has impelled me to abandon that inclination.

The latest and best discussion of the question I have found is in the case of *Pickup* v. *Thames Ins. Co.* 3 Q. B. Div. 594. It is there adjudged that the burden of proving unseaworthiness is on the insurer, there being a *prima facie* presumption of seaworthiness in favor of the assured. The probative value of the fact that a loss occurs without any extraordinary action of the elements, or any discernible peril to cause it, is treated as sufficient, *in the absence of other proof* and under some circumstances, to establish the unseaworthiness at the time the risk commenced. The time between the sailing and the disaster is an element for the consideration of the jury more or less cogent according to circumstances, and it is for the jury to say whether, under the circumstances of the voyage, the time of loss was so soon after sailing that it raises the presumption of unseaworthiness. It is not a presumption of law at all, nor a fixed presumption of fact either way, but a matter of inference by the jury under all the proof from the special circumstances of the case. I think the case cited correctly states the law according to the weight of the author-

ities, though perhaps many of them do not treat the *prima facie* assumption of seaworthiness as a presumption, throwing the burden of proof on the insurer to establish unseaworthiness, but say that the plaintiff must prove the fact of seaworthiness, and the burden is answered by the very slightest proof, such, for example, as the starting on the voyage. It is not, however, far wrong to say that there is, to begin with, a presumption of seaworthiness. But when this is challenged by any proof of the defendant, such as a disaster without apparent cause, from the action of the sea or something external to the ship, the plaintiff must meet that challenge by proof of seaworthiness at the inception of the risk. He may do this by the exhibition of a cause sufficient to occasion the disaster to a seaworthy vessel, by proof of circumstances sufficient to countervail the inference mentioned, or by the testimony of witnesses as to the actual condition of the vessel. But all this is for the jury to weigh and determine the fact according to the special circumstances of each case.

In this case the voyage was nearly or quite ended, the disaster taking place only a few hundred feet from the point where the raft was to have been landed. It had successfully sustained, up to that time, all the perils of the voyage. But counsel say that this was coming down stream with the current, and that the disaster occurred the very moment the raft was turned up stream, and that this is conclusive there was not sufficient strength to resist the up-stream part of the voyage. It was in cribs, the logs being pinned together and the cribs bound together with ropes and chains. One witness did say if it had been more substantially fastened together and more rigid it would have better withstood the current and other difficulties of navigation; but he said, too, that he had put hundreds up this river constructed as this raft was. Other witnesses said the pliable form of construction was the better. Be this as it may, while I might be willing to say it seems more reasonable that the firmer the raft the better for its navigation, yet this is not, as I understand, the test of seaworthiness. It is not the best form of construction that is required to meet the warranty of seaworthiness, but only a sufficient construction for vessels of the kind insured and the service in which they are engaged. It may be that a steel or iron ship would resist a given peril better than a wooden one, or that a ship of one form and construction may be more stanch than one of another; but this is not what is required. To permit this kind of proof to overcome the presumptions arising from established seaworthiness by proof of construction according to the usual mode for the particular class of

vessels, and for that particular service, would be to release the insurer from liability on risks taken upon all vessels not of the best and most skillful construction. 1 Parsons, Marine Ins. 367, 372, 386; 1 Phil. Ins. 308, 309.

I am content to find that the proof in this case establishes that the raft was "seaworthy,"—that is to say, so constructed that it was capable of withstanding the strain of navigation on the voyage insured by the defendant,—and that the other proof in the case overcomes any presumption of inherent defects arising from the want of sufficient proof of extraordinary causes for the disaster, assuming that there are no such causes discernible in this case.

Now, the question arises,—if we have given a "seaworthy" vessel and a disaster without any discernible cause,—is there a presumption that the loss was occasioned by some of the perils insured against? I have found no authority that satisfactorily answers this question put in this form. Cases are abundant which discuss whether this or that "peril," or this or that cause of disaster, comes within the phrase "perils of the sea," (or perils of the river, in this case,) or such other terms contained in the particular policy as may be thought to cover it; as, for example, in most English policies, where there is a phrase now established to mean more than "perils of the sea," when they say "all other perils, losses, and misfortunes that have or shall come to the subject-matter of this insurance, or any part thereof."

The latest and a very able and instructive case on this subject is that of the *West India Tel. Co.* v. *Home Ins. Co.* 6 Q. B. Div. 51. It will be found by examining the cases there cited, and those cited elsewhere in tracing them, that at first the English courts were asked to limit this supplemental clause in their policies upon the principle of *ejusdem generis* construction to such causes as come within the designation "perils of the sea," and upon arguments that seem to me quite difficult to answer. But the courts naturally and very readily laid hold of these additional words to relieve themselves of the always acknowledged difficulty of defining what is meant by "perils of the sea" in what our supreme court calls "an obscure, incoherent, and very strange instrument." *General Mut. Ins. Co.* v. *Sherwood*, 14 How. 361. By this means they got back to the principle of construction—or very nearly so—laid down by Emerigon, namely: that "the general rule is, assurers answer for all loss and damages that happen on the sea," and they seem somewhat to regret that any departure was ever made from it. And in commenting on it, while maintaining the

established rule that the phrase "perils of the sea" does not mean all losses that happen on the sea, Lord Justice Brett agrees that the English law gives this general phrase "as large a construction as you reasonably can."   Id. 60.

The policy here does not, as some American policies do, contain this supplemental clause.   Learned counsel base an argument that it does go as far upon the use of the word "adventures," and the association of the usual words with "railroads, canals," etc.; but I do not think this sound.   The word "adventures" is a time-worn word in these policies, and is used everywhere as synonymous with "perils," or so nearly so that they cannot serve to enlarge the policy in the manner contended for by counsel.   It is often used by the writers to describe the enterprise or voyage as a "marine adventure" insured against.   But it is unnecessary to cite instances of these uses of the word,—though I have gathered many,—because it frequently occurs everywhere in this connection.   As to the use in the policy of "railroads," it is associated with "lakes, seas, rivers, canals, and jettisons" merely as a convenient form of general policy to receive any risk within the scope of the company's business, and it must be construed with reference always to the particular risk.   If it be on the "lakes," it is a risk limited to lake navigation; if on the "seas," to ocean navigation; if on the "river," as here, to river navigation; and if on "railroads," to railroad transportation; and the contract is to be read as if these words were not so associated.   It is a kind of self-distributing policy, according to the subject-matter.

Reasoning that the burden of proof is on the assured to show that the loss occurred by some one of the perils insured against, and that the insurer was not a guarantor of safe arrival, but only an insurer against extraordinary perils, I at first thought the fact that the plaintiff had not made it plain that this loss occurred by some extraordinary peril should turn the case against him.   But having established that the raft was "seaworthy,"—I use this technical term as I do not much relish "riverworthy,"—I do not now see why his case is not in the same condition as if there had been no challenge of that fact.   In other words, if we concede fully that when a disaster happens in fair weather, and without apparent sea peril, there is a presumption of unseaworthiness, when that presumption of fact is rebutted,—as I have shown it may be, and as I hold it has been in this case,—does it not logically follow that the loss occurred by a "peril of the sea?" I think so, unless the insurer proves that it occurred by some cause not within that designation, or which has been excepted from the

policy. All navigation is perilous, and this policy does not say the indemnity is against *extraordinary* perils only. It is true, we are in the habit of saying that the insurer is only liable for extraordinary perils, but this means nothing more than that a seaworthy vessel will endure safely all ordinary perils. It does not mean that a loss for which the insurer is liable may not come from the ordinary action of the sea, for it may; and the term is used only to describe those abnormal circumstances, be they what they may, of dangerous navigation under which the loss occurs.

Now, the proof in this case is clear, I think, so far as the observation of the witnesses goes, that there was nothing extraordinary in the currents or winds, or other elements of danger to the raft; and, so far as I can see, all engaged were doing the very best they could in the conduct of the navigation. But *non constat* that there was not some abnormal action of the current or the wind, or some other force engaged not detected or observed by the witnesses, or some negligence of the people concerned not recognized as such, or some combination of all these, to cause the loss. Because we cannot locate the "peril," it does not follow there was none. Given a seaworthy craft, in the absence of all proof to the contrary, I think the presumption is that the disaster occurred from some extraordinary cause, although indiscernible; and I place this presumption precisely where the antipodal presumption we have been considering is placed in *Pickup* v. *Thames Ins. Co. supra.* There the court requires the assured to rebut the presumption of unseaworthiness by proof, and here, it seems to me, the insurer must rebut the presumption of loss by peril insured against by proof of loss by other means.

Technical difficulties about the "burden of proof," and its shifting from one party to the other, are made plain by that case, and, if we observe the distinction between the "burden of proof" as it exists as as a matter of pleading merely, and as it is less technically applied to the exigencies created by the sometimes shifting force of the testimony in respect to its imposing a burden of further evidence on the one side or the other to bring about that preponderance of probative value necessary to convince the minds of the triers of the fact in issue, these all vanish, and, though sometimes difficult, it is not impossible to reach a rational solution of the issue.

But I do not base my judgment wholly on the above presumption. While the proof is unsatisfactory as to the precise cause of the loss, I think it may be taken to establish that it was the combined action of the two currents and the strain of the tugs under the difficulties of

the situation, the immediate cause being, perhaps, the withdrawal of the De Soto. How far negligence or unskillfulness in handling the tow contributed to it is difficult to say, but perhaps largely. That this was a peril insured against I have now no doubt, and it was a mistake to rule that because there was apparently no extraordinary condition of wind and current there was no peril of navigation to cause the loss. The tide of the sea is as ever present and as normal in its action as the current of a river. It ebbs and flows, but its action is understood, and a matter of almost accurate knowledge and calculation to navigators. Yet in *Fletcher* v. *Inglis*, 2 Barn. & Ald. 315, and in *Bishop* v. *Pentland*, 7 Barn. & C. (14 E. C. L. 33,) and other cases where there was no *extraordinary* action of the tide, its ordinary action occasioned a loss, through defective fastenings with cables, that was held to be within the policy. And in *Smith* v. *Scott*, 4 Taunt. 126, there was no extraordinary action of the sea to cause the collision, but only negligence of the vessel colliding with the one insured which was the extraordinary circumstance. · Lord MANSFIELD said: "I do not know how to make this out not to be a peril of the sea. What drove the Margaret against the Helena? The sea. What was the cause that the crew of the Margaret did not prevent her from running against the other? Their gross and culpable negligence; but still, the sea did the mischief." And in *Devaux* v. *J'Anson*, 5 Bing. (N. C.) 519, (35 E. C. L. 207,) and *Walker* v. *Maitland*, 5 Barn. & Ald. 171, (7 E. C. L. 59,) and many other cases, including those already cited, it is established beyond question that the policy covers negligence of the officers and crew where, of course, there is no fraudulent collusion with the owner; and these cases have been approved by our own supreme court in *Waters* v. *Merchants' Ins. Co.* 11 Pet. 213. It is true that in most, if not all, those cases the supplemental words before referred to were found in the policy, but our supreme court does not predicate its judgment on these words. The loss there was by "fire," which was specially mentioned in the policy, and that it was occasioned by negligence of the crew was held not to excuse the insurer. So, here, the action of the two currents, and the force of cables and tugs applied to this raft, were the ordinary forces of river navigation acting on it with sufficient force to part the raft and cause a portion of it to be lost. This was a "peril of the river." Whatever negligence of the crew contributed to this cannot excuse it, and the loss was within the terms of the policy. The perils of our river navigation are more insidious, perhaps, than those of the sea,

and far more difficult, I should think, to trace as precise causes acting to occasion a loss.

Applying the principles of construction already mentioned, it would be placing upon a policy-holder too great a burden to require him in a case like this to demonstrate with exactness what particular force operated to make his loss, and that there was some extraordinary action of the winds or currents, or extraordinary stages of water, or the like. It would emasculate these policies and reduce their value to permit this company to escape on the facts of the case, because, forsooth, the witnesses could *see* nothing in wind, current, or navigation that was not in the usual and ordinary course.

I have, following the counsel, treated this case as if this raft were a "vessel," but I think it is not. The policy is not one on a vessel, but on the *cargo* of a vessel, and is called by its terms a "cargo policy." I have not been able to find any discussions of the subject of insurance of rafts, but in an elaborate case the learned judge of the eastern district of Michigan, sitting in this court, held that a raft of logs floating unattached to any vessel and navigated by men upon it was not a vessel within the admiralty jurisdiction. *Raft of Logs*, 1 Flippin, 543. I think it must be treated as the cargo of the tow-boat having it in charge, and not as a "vessel." But so treated the principles of insurance law applicable to the case are the same, and the distinction is quite immaterial. It is mentioned here merely out of caution, and to explain the method of dealing with the subject. On the whole, the plaintiff must have judgment for his partial loss, and if the parties cannot agree on the amount, I will adjudge it, on application to enter the judgment.