CARLOS MERINO, como sucesor de Rafael Seijo Casaldere, demandante y apelado, *v.* THE GLOBE RUTGERS FIRE INSURANCE COMPANY, demandada y apelante.

No. 3785.—*Visto:* Marzo 11, 1926. *Resuelto:* Abril 29, 1926.

1. APELACIÓN Y ERROR—REVISIÓN—CUESTIONES DE HECHO, VERFDICTOS Y CONCLUSIONES—APRECIACIÓN DE LAS PRUEBAS—CONCLUSIONES SOBRE LA MISMA. —Atendidas las alegaciones y las pruebas de este caso y habida en consideración la actitud de la demandada durante el curso del litigio, se resolvió que la corte sentenciadora estuvo justificada al declarar probada la venta al demandante de la goleta asegurada así como el traspaso de la póliza al comprador.

2. SEGUROS—DEL CONTRATO EN GENERAL—SU INTERPRETACIÓN Y EFECTO (*Operation*)—CLÁUSULAS ESCRITAS EN FORMA ESPECIAL Y CLÁUSULAS IMPRESAS— SEGURO "POR CUENTA DE QUIEN LE PUEDA INTERESAR".—Expedida póliza de seguro marítimo a favor de una persona determinada "por cuenta de quien le pueda interesar"—frase contenida y escrita en la póliza en forma especial—dicha póliza garantiza el derecho de un comprador subsiguiente y da a éste derecho a recobrar por pérdidas aún cuando exista una estipulación impresa en dicha póliza que sea inconsistente con ese derecho.

3. SEGUROS—ACCIONES SOBRE PÓLIZAS—EVIDENCIA—PESO DE LA PRUEBA—PRUEBA RESPECTO A QUE LA EMBARCACIÓN ESTABA EN CONDICIONES DE HACERSE A LA MAR.—Toda embarcación se presume que está en condiciones de hacerse

a la mar hasta que se pruebe lo contrario, y el peso de la prueba de que no lo estaba descansa sobre la compañía aseguradora.

4. Seguros—Riesgos y Causas de Pérdidas—Seguros Marítimos—Peligros de Mar Cubiertos por el Contrato—Choque con Troncos Arrastrados por las Corrientes de Mar.—El choque de una goleta con troncos de árboles que llevados por las crecientes de tierra son arrastrados por las corrientes del mar, constituye uno de los "peligros de mar" cubiertos por la póliza.

5. Apelación y Error—Revisión—Su Alcance y Extensión en General—Suficiencia de la Demanda—Omisiones Subsanadas (*Cured*) por la Prueba.—Una parte no puede alegar con éxito en apelación que una demanda no aduce causa de acción, cuando la base de la causa de acción ejercitada está en la demanda y lo que faltaba en ella se completó por la prueba practicada sin objeción por dicha parte.

Sentencia de *Charles E. Foote,* J. (Primer Distrito, San Juan), declarando con lugar la demanda, con costas. *Confirmada.*

*Jaime Sifre, Jr.,* y *Horacio Franceschi,* abogados de la apelante; *Antonsanti & La Costa,* abogados del apelado.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

Se trata de un pleito iniciado para el cobro de cierta póliza de seguro. Celebrada la vista, la corte de distrito dictó sentencia el 23 de marzo de 1923, declarando la demanda sin lugar, con costas. El 5 de septiembre siguiente el demandante presentó una moción pidiendo a la corte, de acuerdo con el artículo 140 del Código de Enjuiciamiento Civil, que lo exonerara de los efectos de la sentencia. La moción fué denegada. Apeló el demandante para ante este tribunal con éxito, 33 D.P.R. 421, y devuelto el caso a la corte de distrito, ésta dejó sin efecto su sentencia. Juzgado el pleito de nuevo, la sentencia fué favorable al demandante, habiendo interpuesto entonces la demandada el presente recurso de apelación, cuyo señalamiento de errores es así:

"I.—La corte cometió error manifiesto al apreciar la prueba en este caso, y declarar probado que el demandante Carlos Merino era dueño de la goleta asegurada por la demandada, y que la póliza expedida por la demandada le había sido cedida y traspasada a dicho demandante.

"II.—La corte cometió error al declarar con lugar la demanda porque el demandante no estableció que entre él y la demandada

existiera néxo jurídico alguno por el cual ésta viniera obligada a pagarle a aquél por concepto alguno.

"III.—La corte cometió error manifiesto al declarar que la goleta asegurada 'María Magdalena' estaba en buenas condiciones de hacerse a la mar en su último viaje, en el cual naufragó.

"IV.—La corte cometió error manifiesto al declarar probado que el naufragio de la goleta 'María Magdalena' se debió a un peligro del mar.

"V.—La corte cometió error al declarar con lugar la demanda toda vez que no se probó que la causa del hundimiento de la goleta María Magdalena fuera uno de los riesgos comprendidos en la póliza expedida por la demandada.

"VI.—La corte cometió error al denegar la excepción previa de falta de causa de acción presentada por la demandada y basada en que en la demanda no se alegaban hechos suficientes para constituir una causa de acción."

[1.] Examinemos el primer error. Hemos leído cuidadosamente las largas e inteligentes observaciones del abogado de la parte demandada y apelante sobre el particular y la verdad es que no se concibe cómo en un caso tan debatido como éste y teniendo a su alcance una prueba documental terminante, dejara el demandante de presentarla, corriendo el riesgo de perder otra vez sus alegados derechos sin que le fuera dable a la corte penetrar en el examen del mérito de los mismos.

Hecha esta manifestación, diremos, sin embargo, que un estudio cuidadoso de las alegaciones y las pruebas y de la ley y la jurisprudencia, uniendo detalles y habiendo en consideración la misma actitud de la parte demandada durante todo el curso del litigio, permite concluir que la corte sentenciadora estuvo en lo cierto al declarar probado:

"Que en el mes de abril, del año 1921, dicho Seijo vendió la goleta asegurada al demandante Carlos Merino, entregándole a éste por conducto de su apoderado la póliza expedida por la demandada."

En el hecho tercero de la demanda enmendada que está jurada, se alega que Seijo vendió al demandante la goleta

en cuestión, y en el quinto, que el demandante notificó el accidente a la demandada. Y al contestar la demandada el hecho tercero alega "que en abril 1 de 1921 Sobrinos de Ezquiaga escribió una carta a Despard & Co., agentes de aseguro, para que al expirar la citada póliza, expedida y librada a nombre de Rafael Seijo Casaldere se expidiera una nueva póliza por la aquí demandada a favor del aquí demandante, y que la demandada ni en abril 1 de 1921, ni en ninguna fecha anterior o posterior, expidió póliza alguna de seguro sobre la goleta María Magdalena a favor del aquí demandante, y también por información y creencia que de acuerdo con los términos de la citada póliza de seguro Rafael Seijo Casaldere no podía vender, ceder ni traspasar la goleta ni la póliza de seguro sin el previo consentimiento por escrito de la demandada y que este consentimiento nunca fué dado." Y al contestar el hecho quinto admitió "que el demandante notificó del accidente a Sobrinos de Ezquiaga y que éstos actuando como agentes del aquí demandante notificaron del hundimiento de la citada goleta María Magdalena a los Sres. Despard & Co., de la ciudad de New York, Insurance Brokers, y que tanto los citados Sobrinos de Ezquiaga como los Sres. Despard & Co. notificaron a la aquí demandada del hundimiento de la referida goleta María Magdalena, suministrándole los informes, datos y documentos usuales en estos casos."

Uno de los documentos introducidos en el juicio como prueba fué una copia certificada por el Deputy Collector of Customs de San Juan, P. R., del "Report of Casualty" presentado en la Aduana de acuerdo con la ley de junio 20, 1874, en que se hizo constar que el demandante era el dueño de la goleta de que se trata.

Por último, Gabriel Palerm, apoderado primero de Seijo y luego de Merino, y administrador de la goleta por cuenta de ambos, sucesivamente, declaró repetidas veces que la goleta fué vendida por Seijo a Merino, terminando su declaración, contestando a preguntas de la demandada, así: "A.—

¿En qué forma se hizo la venta ésta?—T.—Como se hacen todas las ventas, con dinero.—A.—¿Hubo un documento de venta?—T.—Son transferencias de la Aduana nada más." Y con respecto al traspaso de la póliza si bien Palerm insiste en que la póliza no fué traspasada, es evidente que se refiere al documento en que la póliza constaba. El hizo gestiones para que la Compañía expidiera nueva póliza a favor de Merino, y al sostener que la póliza no se traspasó dice que fué "porque no se había terminado el plazo del seguro y no podía traspasarse," y contestando seguidamente a la siguiente pregunta del abogado de la demandada: "¿Seijo nunca le cedió las pólizas a Carlos Merino?", dijo: "Siempre le dió a Carlos Merino el seguro de todo, pero las pólizas no podían traspasarse porque no había terminado el plazo." Otra parte del interrogatorio de Palerm es como sigue: "A.—¿Durante la transferencia de estas pólizas a quién se le entregó la póliza de este caso cuando compró Merino?—T.—Cuando compró Merino las pólizas quedaron siempre en poder mío.—A.—¿Como apoderado de quién?—T.—De Carlos Merino." Y la actuación del testigo cerca de Sobrinos de Ezquiaga y de la demandada antes y después de ocurrido el accidente, sólo es consistente con la venta de la goleta y el traspaso de la póliza a Merino.

El testigo Palerm mereció entero crédito a la corte y las hábiles impugnaciones que en contra suya hace en su alegato la parte apelante no nos convencen de que la corte de distrito abusara de su discreción en tal sentido.

A virtud de las constancias del récord que dejamos indicadas y de otras que quizá hayan escapado en la exposición escrita, sin perder de vista lo dispuesto en la sección 4192 de los Estatutos Federales y en el artículo 573 del Código de Comercio, citados por la apelante en el acto de la vista del recurso y en su memorándum adicional, opinamos que no se ha cometido el primero de los errores señalados.

[2] El segundo error levanta la cuestión más interesante envuelta en el litigio. La póliza se expidió a favor de Ra-

fael Seijo Casaldere "on account of whom it may concern" y contiene además una cláusula que dice: "It is also agreed that this insurance shall be void in case this policy or the interest insured shall be sold, assigned, transferred, or pledged without the previous consent in writing of the insurers."

Es un hecho admitido que para la venta de la goleta y para el traspaso de la póliza, no se obtuvo, ni siquiera se solicitó el consentimiento de la demandada. Los hechos se pusieron en conocimiento de la demandada y se trató de obtener sin resultado una nueva póliza a favor del demandante. Eso fué todo.

Siendo ello así, si se aplicara la última cláusula citada, no sería necesario investigar jurisprudencia alguna para concluir que de acuerdo con el contrato, que es la ley entre las partes contratantes, Merino, el demandante, ningún derecho tenía.

Pero no existe sólo la cláusula prohibitiva citada si que también aparecen de la póliza las palabras "on account of whom it may concern" que hemos transcrito, con la circunstancia de que "on account of" aparece impreso y seguidamente un espacio en blanco que se llenó, con un sello al parecer de goma, con las restantes palabras "whom it may concern," mientras que la cláusula prohibitiva es una de tantas impresa en letra muy pequeña en el cuerpo de la póliza, y tales palabras bajo circunstancias similares, han sido interpretadas en el sentido de que la póliza garantiza el derecho de un comprador subsiguiente aunque el traspaso no fuera hecho con el consentimiento de la compañía aseguradora.

El 11 de noviembre de 1899, el Juez McPherson de la Corte de Distrito de los Estados Unidos, E.D. Pennsylvania, resolvió el caso de *Hagan* v. *Scottish & National Ins. Co.,* de la siguiente manera:

"En diciembre de 1897, Peter Hagan, que entonces era el único

dueño del remolcador 'Senador Penrose,' tomó una póliza de seguro contra incendio por un año en la compañía demandada, asegurando a favor de Peter Hagan & Co., 'por cuenta de quien le pueda interesar, y por una suma que no exceda de $2,000, en el remolcador de hierro Senador Penrose, su casco, aparejo, máquinas, calderas, maquinaria, pertenencias, muebles y provisiones.' Entre las disposiciones impresas de la póliza se declara que el contrato será nulo 'si el interés del asegurado no fuere un interés incondicional y de exclusiva propiedad' o 'en caso de ocurrir cualquier cambio, que no sea debido a la muerte del asegurado, en el interés, título o posesión de la cosa objeto del seguro, * * * ya por razón de procedimiento o sentencia judicial, o por el acto voluntario del asegurado, o por otra causa, o en caso de que esta póliza sea cedida antes de ocurrir una pérdida.' En junio de 1898 Hagan vendió a Martín una participación de la mitad en el remolcador, pero no notificó la venta a la compañía ni obtuvo su consentimiento para la misma. Hubo alguna discusión entre Hagan y Martín sobre el efecto de la venta sobre la póliza y consultaron el asunto con un agente de seguros, llegando finalmente a la conclusión de que la cláusula 'por cuenta de quien le pueda interesar' era suficiente para proteger el interés de Martín sin necesidad de dar paso alguno. La venta incluía un interés en la mitad de la póliza, y Martín satisfizo a Hagan su proporción correspondiente en la prima por la parte del término de la póliza no transcurrido. En el mes de julio la embarcación fué destruída por un incendio. Se presentaron pruebas de la pérdida, pero la compañía se negó a pagar por el fundamento de que bajo las anteriores disposiciones de la póliza la venta a Martín había hecho nulo el contrato.

"La decisión del caso depende del efecto que haya de darse a las palabras 'por cuenta de quien le pueda interesar.' Esta cláusula, en tanto en cuanto esté en conflicto con otra parte del texto de la póliza, debe considerarse como dominante, de acuerdo con bien conocidos principios. Ella expresa el convenio especial de las partes, pues está escrita, mientras que las disposiciones incompatibles con ella están impresas, y las condiciones generales impresas usualmente ceden a las palabras escritas deliberadamente escogidas. Además, aun cuando la corte dudara cuál disposición debe prevalecer, otra bien conocida regla exige que la póliza sea interpretada contra la compañía antes que contra el asegurado; y por consiguiente, por cualquiera de dichos fundamentos, la cláusula que estamos considerando debe prevalecer.

"El efecto que ha de darse a la misma parece estar bien determi-

nado. La corte Suprema, en el caso de Hopper v. Robinson, 98 U.S. 528, L. ed. 219, se expresa como sigue:

" 'Una póliza como la que estamos considerando, a favor de una persona determinada "por cuenta de quien le pueda interesar," o en términos similares, se aplicará para beneficio de las personas que tuvo en mente la persona que la tomó, siempre que ésta tenga la autoridad necesaria de aquéllas, o que aquéllas subsiguientemente adoptaran la póliza. 1 Phil. Ins., sec. 383.

" 'Este es el resultado, aunque las personas de que se trata no sean conocidas por el agente que obtuvo la póliza ni por los aseguradores que por ella se obligaron. Id., sec. 384.

" 'Uno puede llegar a ser parte en un seguro efectuado, sin autoridad previa de él, en términos tales que lo hagan aplicable a su beneficio, adoptándolo antes o después de tener lugar la pérdida, aunque la pérdida haya ocurrido antes de hacerse el seguro. Id., sec. 388.

" 'La adopción de la póliza no tiene que ser necesariamente en una forma determinada. Cualquier cosa que claramente demuestre esa intención es suficiente.'

"El primer paso, por lo tanto, en cualquier caso, es determinar cuál es el interés que la persona que tomó la póliza quiso proteger. No es esencial que tuviera en mente a determinado individuo. Basta con que fuera su intención proteger el interés que luego pasó a la persona agraviada; y si tal fué su intención la póliza puede luego ser adoptada por un subsiguiente dueño, en todo o en parte, del interés asegurado, aunque tal dueño fuera desconocido a la persona que tomó el seguro, o a la compañía, al tiempo de expedirse la póliza.

"En el presente caso no tengo duda alguna (y llego a esa conclusión de hecho) de que Hagan tuvo la intención de asegurar, y dejar asegurado por un año, todo el título de propiedad en la embarcación. No fué su intención proteger meramente el interés que él mismo pudiera tener de tiempo en tiempo. Si ése hubiera sido su objeto la póliza hubiera sido más naturalmente tomada en su propio nombre, omitiendo la frase condicional. Pero él quería proteger el título de propiedad sobre la embarcación, ya recayera en él solo o fuera compartido con o trasferido a otras personas. Siendo ésta su intención, y habiendo Martín más tarde adoptado la póliza por el contrato de venta y satisfecho la parte correspondiente de la prima, creo que no existe otra dificultad. Los hechos hacen caer la controversia dentro de la regla expuesta en Hopper v. Robinson y en otros casos a los cuales no es necesario hacer referencia. En el caso de

Mosser v. Donaldson (Pa. Sup.) 10 Atl. 766, citado por la deman-
dada, resultó claramente que la intención de las partes fué que dos
personas solamente tendrían el beneficio de una frase similar, y ése
fué el fundamento por el cual se negó a una tercera persona el de-
recho a participar en la protección de la póliza. No creo que la
decisión de la corte de apelaciones de Maryland en el caso de Fire
Ins. Ass'n. v. Merchants' & Miners' Transp. Co. (Md.) 7 Atl. 905,
esté en conflicto con la regla establecida por la Corte Suprema de
los Estados Unidos, pero si existe conflicto mi deber es claro.

"Se registrará sentencia por $1,533.33 a favor del demandante,
con intereses a partir de octubre 8, 1898, y las costas." Hagan et
al. v. Scottish Union & National Ins. Co., 98 Fed. 129–31.

El decreto de la corte de distrito fué apelado a y revo-
cado por la Corte de Circuito. Llevado entonces el caso a
la Corte Suprema de los Estados Unidos, ésta a su vez re-
vocó la decisión de la Corte de Circuito y dejó en pie la de
la de distrito. La opinión fué escrita por el Juez Peckham.
Transcribe primero parte de la opinión de la corte de dis-
trito y luego parte de la de la Corte de Circuito y dice:

"En estas dos citas de las opiniones escritas por las cortes infe-
riores encontramos el criterio de los jueces de dichas cortes sobre la
cuestión en controversia. Es de observarse, en primer lugar, que
la póliza en cuestión cubre bienes que están en el agua, o sea, un
remolcador, y sin embargo la parte impresa de la póliza demuestra
que era para ser usada generalmente para asegurar bienes en tierra.
Se hizo una póliza marítima en blanco que no eran para esa clase
de seguro. Por consiguiente, muchas de las condiciones impresas
eran enteramente inaplicables al aseguro de bienes en el agua.

"Cuando una póliza marítima es así expedida en un blanco de
póliza muchas de cuyas condiciones son para el aseguro de bienes o
artículos en tierra, se hace doblemente importante conservar y apli-
car estrictamente la regla de que la parte escrita prevalecerá sobre
la parte impresa de una póliza, pues en tal caso lo escrito demostrará
aún más claramente que de costumbre el verdadero convenio entre
las partes. Las cortes nunca tratarán de limitar lo que de otro modo
sería el significado y efecto de las condiciones escritas, recurriendo
a alguna condición impresa de la póliza que, de ser aplicada, cam-
biaría tal significado y haría sustancialmente inútil y sin aplicación
la parte escrita.

"En el caso de Dudgeon v. Pembroke, resuelto en la Cámara de los Lores de Inglaterra en 1877, 2 App. Cas. 284, en la página 293, al hablar en la opinión de la corte sobre esta cuestión de la diferencia entre las partes escritas y las impresas de una póliza, Lord Pensance dijo:

" 'Señores, la póliza en este caso es una póliza de tiempo y no de viaje, y no sólo eso sino que es una póliza ordinaria de tiempo. No puede haber, me parece, duda alguna sobre ese punto. Se ha sugerido que por estar la póliza extendida en un blanco impreso cuyas condiciones impresas son aplicables a un viaje y también a artículos así como al barco, la póliza es algo menos, o algo más, que una póliza de tiempo. Pero la práctica de los hombres de comercio de escribir en sus formas impresas las condiciones específicas mediante las cuales desean describir y limitar el riesgo que se trata de asegurar, sin tachar las palabras impresas que serían aplicables a un contrato más amplio o distinto, es muy bien conocida y ha sido demasiado constantemente reconocida en las cortes para permitir tal conclusión.'

"Esta regla es reconocida y aprobada por las dos cortes inferiores. Si hay alguna incompatibilidad entre las condiciones escritas de la póliza y las partes impresas de la misma, los términos escritos deben prevalecer. Se hace, por tanto, necesario, determinar cuál es el significado de la parte escrita de la póliza, y cuál fué la intención de las partes al escribir las palabras 'por cuenta de quien le pueda interesar.' Ambas cortes inferiores están contestes en que una póliza con dicha frase cubre el interés de la persona que tenía en mente el que tomó el seguro, aunque dicha persona no fuera entonces conocida. Se dijo por la corte de distrito que era bastante con que la persona que tomaba el seguro tuviera la intención de proteger los intereses que luego pasaron a la persona agraviada, y que no era esencial que aquélla tuviera en mente un individuo específico al tiempo de tomar el seguro. La opinión de la Corte de Apelaciones admite que una póliza a nombre de una persona en particular 'por cuenta de quien le pueda interesar' cubre el interés de la persona que tenía en mente el que tomó la póliza, aunque la persona no fuera conocida. Pero dicha corte de apelaciones nada pudo encontrar en el caso que justificara la conclusión de que Hagan (la persona que tomó el seguro) tenía la intención de asegurar a un futuro comprador de la embarcación o de una participación en la misma, por haberse conservado en la póliza la condición impresa de que sería enteramente nula, a menos que lo contrario se conviniera, en caso de cualquier cambio de interés, título o posesión. La reten-

ción de esta disposición impresa, según la corte, impedía inferir intención alguna de que la póliza fuera aplicable a alguna persona que reclamara al amparo o por virtud de tal traspaso.

"Estamos conformes en que por virtud de la frase contenida en la póliza, 'por cuenta de quien le pueda interesar', no es necesario que la persona que toma la póliza tenga entonces en mente algún individuo específico. Si su intención era que la póliza cubriera el interés de cualquier persona a quien él pudiera vender todo o parte de la cosa asegurada, ello era bastante. En el caso de Hooper v. Robinson, 98 U.S. 528, se dijo que una póliza sobre un cargamento a favor de A, por cuenta de quien le pueda interesar, beneficiará a la persona que A tenía en mente, siempre que al tiempo de efectuar el seguro A tuviera la necesaria autoridad de tal persona o que ésta hubiera subsiguientemente adoptado la póliza. Los hechos en dicho caso difieren materialmente de los presentados en estos autos, pero el significado de la expresión 'por cuenta de quien le pueda interesar' está expuesto en la opinión de la corte, y en la misma se citan autoridades que demuestran que no es necesario que al tiempo de efectuar el seguro la persona que lo tomó tuviera en perspectiva el beneficio de algún individuo particular entonces conocido, y que dicha frase cubre el caso de uno que tenga un interés asegurable al tiempo de ocurrir la pérdida y a quien se trató de proteger al tiempo de tomar el seguro.

*     *     *     *     *     *     *

"Nos vemos obligados a discrepar del criterio de la corte de circuito de apelaciones al decir que nada había en el caso que justificara la conclusión de que Hagan tuvo la intención de asegurar a un futuro comprador de la embarcación o de una participación en la misma, por haberse preservado en la póliza la condición de que sería enteramente nula, a menos que lo contrario se conviniera, en caso de cualquier cambio, etc. Nos parece que precisamente la intención al decir que el seguro era por cuenta de quien le pudiera interesar fué anular las disposiciones impresas con respecto a exclusiva propiedad y a traspaso de intereses. Era una cláusula conviniendo 'lo contrario' de lo dispuesto en la parte impresa de la póliza. Preveía la contingencia de que al tiempo de la pérdida la persona que tomó el seguro no fuera el único e incondicional dueño de la cosa asegurada por razón de un traspaso de título o interés ocurrido por el acto de tal persona entre el momento de tomar el seguro y el acaecimiento de la pérdida.. Creemos que ésa fué la intención de la persona que tomó el seguro, deducida de la lectura de la parte escrita de la póliza y mediante referencia al hecho de

que su intención fué asegurar todo el título y no meramente el interés que dicha persona tuviera de tiempo en tiempo. De lo contrario no vemos qué efecto se da a la parte escrita del documento.

   \*        \*        \*        \*        \*        \*        \*

"Cuando Hagan tomó el seguro él era el único dueño, y a menos que su intención fuera que las palabras escritas se aplicaran a aquellas personas a quienes él luego pudiera ceder su interés o alguna parte del mismo, la expresión parecería no tener finalidad alguna.

"Si la póliza hubiera de quedar nula en caso del traspaso de todo o una parte del interés de la persona que tomó el seguro, a menos que la compañía fuera notificada y se conviniera dicha traspaso mediante endoso en la póliza, no vemos que la inserción de la frase en cuestión produjera alteración alguna en sus términos y significado. De acuerdo con la interpretación que sostiene la compañía, ella tendría, estando en la póliza la disposición escrita, igual derecho a negarse a convenir en un traspaso de interés que si dicha disposición fuera quitada,.y los términos de la póliza en realidad no serían alterados por la inserción de esa disposición. Creemos que ello sería un resultado enteramente distinto del que tuvieron en mente las partes. Las palabras 'por cuenta de quien le pueda interesar' no se refieren solamente a las personas interesadas en la póliza al tiempo de expedirse. La condición se refiere al futuro. No es una cuestión de las personas interesadas al tiempo de tomarse la póliza, sino de aquellas que puedan estar interesadas al ocurrir la pérdida y que estuvieron en la mente del que tomó el seguro en el momento de hacerlo. Es por cuenta de aquellos que en el futuro, al tiempo de ocurrir una pérdida, posean el interés asegurable y con respecto a quienes la póliza se aplicará. Creemos que ésta es la interpretación sensata del lenguaje empleado, justificada y exigida por las autoridades, muchas de las cuales se citan en el caso de Hooper v. Robinson, supra." *Hagan* v. *Scottish Ins. Co.,* 186 U.S. 428–33.

En su alegato la parte apelante sostiene que el caso de Hagan es distinto a éste porque en el de Hagan se usó una forma impresa preparada para seguros en tierra y aquí la forma impresa estaba especialmente preparada para seguros de mar.

Si se observa el lenguaje de la Corte Suprema se verá que se pone énfasis en tal circunstancia para concluir que

es doblemente importante para aplicar estrictamente la regla, pero ello no quiere decir que la regla se base en la indicada circunstancia.

La razón es que las formas impresas se preparan con anterioridad para abarcarlo todo, mientras que las palabras que especialmente se escriben o consignan en el momento mismo de otorgarse el contrato deben ser y son predominantes porque expresan la actual voluntad de las partes que contratan.

Insistiendo en distinguir el caso de Hagan, la parte apelante sostiene también que de los hechos de dicho caso se desprende que cuando Hagan efectuó el seguro no tenía a ninguna persona particular en mente, mientras que aquí la prueba demostró que Palerm obtuvo el seguro a nombre de Seijo para garantizarse a sí mismo de cierta hipoteca que tenía constituída sobre la goleta.

Debe aclararse que la prueba demuestra que en efecto Palerm era dueño de una hipoteca constituída sobre la goleta por Seijo, pero demuestra también que cuando Seijo vendió a Merino, Palerm cobró su crédito, y nada existe en ella que demuestre que la póliza se tomó para garantizar exclusivamente a Palerm.  Puede admitirse que estuvo en la mente de Seijo al asegurar su goleta el garantizar su deuda a Palerm, pero ello en modo alguno excluye la idea de poder garantizar también en el futuro cualquier otro contrato posterior.

Los casos que cita la apelante y los autores que invoca, no destruyen en manera alguna la jurisprudencia establecida por la Corte Suprema de la nación.  Y aplicando esa jurisprudencia es necesario concluir que tampoco erró la corte de distrito al sostener como sostuvo ''que Rafael Seijo Casaldere al tiempo de vender la goleta 'María Magdalena' a Carlos Merino y entregarle la póliza que aseguraba la misma no estaba obligado en forma alguna a solicitar ni obtener permiso de la compañía demandada para verificar esa transferencia y que esa venta podía verificarla como la

verificó sin que por eso se considerara nulo el contrato de seguro.''

[3, 4] Los errores 3, 4 y 5 pueden estudiarse conjuntamente.

Entre otros, la corte de distrito declaró probados los siguientes hechos:

''Que allá por el mes de abril de 1921, y dentro del período cubierto por la póliza la goleta emprendió viaje desde el puerto de San Juan al de Aguadilla y desde éste al de Mayagüez y que allá por el día 28 de abril del mismo año y de noche salió del puerto de Mayagüez con rumbo a Santo Domingo.

''Que antes de salir de Mayagüez, así como en los puertos mencionados anteriormente se probaron las bombas como de costumbre, encontrándose que el barco no contenía agua alguna y que el mar se encontraba en calma, había poca brisa y alguna corriente y mientras la goleta navegaba por el canal, la tripulación sintió un golpe contra uno de los costados de la misma como si fuera un tronco de madera u otro objeto que suelen traer las corrientes por esos sitios y el capitán de la goleta con otros de la tripulación alumbraron sobre el costado de la goleta para averiguar el motivo del golpe sin ver objeto alguno.

''Que por la madrugada del día 29 de mayo (sic) de 1921 como a 30 millas de las costas de Puerto Rico, el timonel que estaba de guardia se dió cuenta de que la embarcación se estaba llenando de agua y llamó al capitán y demás tripulantes observándose que la goleta contenía de 4 a 6 pies de agua, e inmediatamente se pusieron a trabajar las dos bombas que tenía el barco y que el agua era tanta y entraba tan rápidamente que las bombas no daban abasto para extraerla y que por la tarde del 29 de abril de 1925 la tripulación tuvo que abandonar la goleta, hundiéndose ésta a los pocos momentos.

''Que la tripulación toda en un botecito llegó al puerto de Aguadilla donde levantaron la protesta usual en tales casos.

''Que la goleta 'María Magdalena' era nueva, teniendo como un año de construída y que pocas semanas antes de emprender este viaje se le había practicado una inspección general y se raspó el casco y pintó de nuevo, encontrándose en buenas condiciones.

''Que es frecuente encontrarse por el sitio donde navegaba la goleta al tiempo de sentirse el golpe, troncos de maderas y otros objetos flotantes que pueden causar daños a embarcaciones si chocasen

y que aún con el mar en calma y viento moderado, debido a las corrientes que existen en esos sitios, el choque de un objeto con una embarcación como en el caso presente puede abrir, como estamos convencidos abrió una grieta en uno de los costados de la goleta.''

Hemos analizado la evidencia practicada y a nuestro juicio sostiene los hechos declarados probados por el juez sentenciador. No hay el más leve indicio de fraude. Se trataba de una embarcación relativamente nueva y se tomaron todas las precauciones que usualmente se toman en estos casos. El hecho de que la arena que conducía como lastre la goleta obstaculizara finalmente el funcionamiento de las bombas, en que tanto insiste la apelante, no quiere decir que el hundimiento se debiera a la arena. No estaba prohibido hacerse a la mar con dicho lastre y las bombas se usaron hasta el límite. No se requiere que las bombas estén siempre libres de cualquier obstáculo que puedan producir en su funcionamiento el lastre o el cargamento del buque.

Como demuestra el apelado en su alegato, los hechos de este caso son distintos de los del de *Pacific Coast S. S. Co. v. Bancroft Whitney Co.,* 94 Fed. 180. Aquí hubo prueba directa, toda la que podía presentarse,—ya que no es posible que se pida que cada vez que una goleta intenta salir de viaje sea examinada sin omitir el más pequeño espacio por algún ingeniero naval,—de que la embarcación se encontraba en buenas condiciones. Acababa de recibir una reparación general, había navegado sin dificultad desde San Juan a Aguadilla y a Mayagüez y fué examinada por sus mismos empleados en la forma usualmente aceptada antes de salir para Santo Domingo. El naufragio ocurrió como a treinta millas de la costa, y la causa probable del mismo, surgida después de la partida, se explica satisfactoriamente por la prueba.

Además la parte demandada no ofreció prueba alguna de que la goleta no se encontraba en buenas condiciones cuando salió para Santo Domingo y se ha decidido repetidamente que:

"El peso de la prueba de que una embarcación no está en condiciones de hacerse a la mar descansa sobre la compañía de seguros. La presunción de ley es que toda embarcación está en condiciones de hacerse a la mar hasta que lo contrario se pruebe. Gow on Marine Insurance, p. 273; Arnould on Marine Insurance, par. 725; Adderly v. American Mut. Ins. Co., Fed. Cas. No. 75; Bullard v. Roger Williams Insurance Co., Fed. Cas. No. 2122; Lunt v. Boston Marine Insurance Co. (C.C.) 6 Fed. 562; Moores v. Louisville Underwriters (C.C.) 14 Fed. 226; Guy v. Citizens' Mutual Insurance Co. (D.C.) 30 Fed. 695; Earnmoor v. California Insurance Co. (D.C.) 40 Fed. 847; Nome Beach Lighterage & Transp. Co. v. Munich Assur. Co. (C.C.) 123 Fed. 820, 824; Thames & Morsey M. Insurance Co. v. Pacific Creosoting Co., 223 Fed. 561, 570, 139 C. C.A. 101." *Fireman's Fund Ins. Co.* v. *Globe Nav. Co.,* 236 Fed. 623.

A nuestro juicio demuestra también la evidencia que el accidente se debió a un riesgo del mar cubierto por la póliza.

Abundantísima jurisprudencia existe y mucha de ella se cita por las partes sobre este extremo. En la póliza constan estas palabras: *"Touching the adventure and perils which the said company is contented to bear, and take upon itself, in this voyage, they are of the Seas, Fire, . . . ."* Y como es indudable que el mar tiene corrientes y que esas corrientes arrastran troncos de árboles que al mar llevan las crecientes de tierra, uno de los peligros que corren las embarcaciones en el mar es chocar con esos troncos sin ser vistos, sin negligencia alguna por parte de los que gobiernan el barco, pudiendo el choque, en embarcaciones de la clase de la que se trata en este caso, abrir una grieta inmediatamente o después de tal naturaleza que penetre por ella un caudal tan grande de agua que ocasione el hundimiento sin que sea posible evitarlo usando hasta el límite las bombas y el esfuerzo de toda la tripulación. Y eso fué lo que la prueba demuestra que ocurrió en este caso.

[4] Resta sólo considerar el error que se alega cometido por la corte al resolver la excepción previa formulada por

la demandada a la demanda que fué sometida sin discusión y declarada sin lugar por la corte.

Se sostiene por la apelante que la demanda no aduce causa de acción porque no alega que la póliza estaba vigente al tiempo del siniestro.  Contesta el apelado que la alegación concreta cuya falta hace notar la apelante se hizo constar por entrelíneas en el original en la corte de distrito, pero que aún admitiendo que no se hubiera hecho no era necesaria porque del contexto general de la demanda se desprende que el seguro estaba vigente a la fecha del accidente, y así resulta en efecto del estudio que de la demanda enmendada hemos hecho.

Y sostiene por último la apelante que tal como está redactada la demanda no puede deducirse de ella que el hundimiento de la goleta se debiera a uno de los riesgos del mar garantizados por la póliza.  En la demanda se alega que "mientras la referida goleta se encontraba como a 30 millas de las costas de Puerto Rico, el capitán de la misma descubrió una grieta en el casto de la embarcación, siendo tanta el agua que entraba por ella que las bombas que al efecto se pusieron a trabajar no dieron abasto para sacar el agua que entraba, dando lugar a que se hundiera dicha goleta, a pesar de todos los esfuerzos que la tripulación hizo para salvarla; pero que a pesar del trabajo que hicieron durante todo el día, a eso de las cuatro de la tarde de dicho día la tripulación tuvo que abandonar la goleta porque era imposible salvarla y se hundía rápidamente, siendo lo ocurrido accidental, no teniendo culpa en parte alguna el capitán, ni la tripulación en lo ocurrido, ni por negligencia o falta de experiencia de la tripulación ni del capitán."

Aunque la causa productora de la grieta no se especificó en la demanda, creemos que atendidas todas las circunstancias concurrentes, no era absolutamente necesario.  Podría sostenerse que la demanda no era todo lo perfecta que debió ser, pero la base estaba en ella, y lo que faltaba fué

completado por la prueba practicada sin objeción por parte de la demandada.

*A virtud de todo lo expuesto, debe confirmarse la sentencia. recurrida.*